

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-09-248-CV

GLENDA AND LARRY RICE                                    APPELLANTS

V.

METROPOLITAN LIFE                                          APPELLEE
INSURANCE COMPANY

------------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

In this life insurance dispute, appellants Glenda and Larry Rice raise ten points to appeal the trial court's order granting the traditional and no-evidence summary judgment motion of appellee Metropolitan Life Insurance Company (MetLife). We affirm in part and reverse and remand in part.

## Background

Underlying facts

Glenda purchased group universal life (GUL) insurance for herself and a life insurance rider for her husband Larry, as her dependant, from MetLife through a plan offered by her employer, Avon Products, Inc. Larry's rider provided $50,000 in coverage. Glenda retired from Avon in March 2003.

MetLife sent a letter dated May 10, 2003 that was addressed to Glenda and described her insurance options upon retirement. The letter contained information in its upper right corner, under the title of "Coverage Information as of 5/10/2003," about the amount of Glenda's own coverage and of Larry's coverage (described specifically in the letter at $50,000). It then stated in part,

> You've worked for many years to ensure a solid financial future. Now it's time to relax and let us keep a promise that we made to you when you enrolled for Group Universal Life insurance. You trusted MetLife to provide a flexible life insurance benefit that would meet a lifetime of protection needs. Now, at this very important stage of your life, we'd like to continue to offer you a menu of coverage options. Most likely, your coverage needs have changed since you first enrolled for GUL. The enclosed brochure and options sheet explains the options now available to you.

> Please review these options carefully. Please note that your current coverage will remain effective while you assess your choices . . . . To choose an option, simply complete the attached election form, sign where indicated, and return to MetLife in the envelope provided. . . .

2

We look forward to continuing to serve your needs and help you keep your promises. Again, congratulations and our best wishes during your retirement!

The election form explained Glenda's coverage options: (1) "CONTINUE MY GUL COVERAGE," (2) "ELECT A PAID-UP BENEFIT," (3) "ELECT A METLIFE ANNUITY," or (4) "SURRENDER YOUR COVERAGE & RECEIVE YOUR CASH FUND BALANCE." Glenda initially sent MetLife a fax in which she chose the fourth option, but later on the same day that she sent the first fax, after speaking with a MetLife employee named Summer, Glenda sent another fax stating that she wanted to continue her coverage under the first option. The second fax that Glenda sent stated in part, "I just discussed my decision to retain my coverage with Summer, your customer service associate. She has assured me my coverage will neither lapse nor be cancelled."

The certificate of insurance for Glenda's group life insurance plan states that term life insurance for dependants ends on the date of the employee's retirement.[1] However, for about two and a half years after Glenda's retirement, MetLife continued to bill and accept quarterly premium payments for both Glenda's coverage and Larry's rider coverage. Glenda received a "Group

_____

[1]During discovery, Glenda admitted that she received the certificate; her admission does not indicate when she received it.

3

Universal Life Report" for the period of January to December 2005 that mentioned Larry's $50,000 in coverage.[2]

In July 2005, MetLife discovered that it had billed the Rices for Larry's coverage since Glenda's retirement in 2003, so in the latter part of 2005, MetLife stopped billing the Rices for that coverage without notice to Glenda. When Glenda received the bill for the final quarter of 2005, she saw for the first time that MetLife had stopped billing for Larry's coverage. When she called MetLife in December 2005, MetLife's employee, Angelica Ridge, explained to her that MetLife did not cover term life insurance for dependants under the Avon group policy upon an employee's retirement and that Larry's coverage had been canceled "effective July 2005."[3] Glenda told Angelica that no one notified her of Larry's coverage cancellation. Despite this, according to Glenda, Angelica told her that the premiums that Glenda had paid for Larry's coverage

---

[2]The Group Universal Life Report shows the values of the coverage and details financial activity related to the coverage.

[3]MetLife later corrected the effective date of the cancellation of Larry's coverage retroactively to March 2003 (the month of Glenda's retirement). According to MetLife, it discovered its billing mistake in a records audit. MetLife's representative Mark Money swore, "[T]he dependent spouse coverage must be manually changed in the system. When Mrs. Rice retired she continued her life insurance coverage and was billed on a quarterly basis. Mistakenly[,] MetLife's system was not manually changed to end the dependent spouse coverage billing."

would not be refunded and that Larry's coverage was in place through July 2005.

Procedural history

The Rices filed claims against MetLife for bad faith, breach of contract, violation of the Texas Deceptive Trade Practices-Consumer Protection Act (DTPA),[4] violation of chapter 541 of the insurance code,[5] money had and received (based on the nonreturn of the Rices' premium payments for Larry's coverage), promissory estoppel, breach of fiduciary duty, and fraud by nondisclosure. MetLife filed, in one document, a traditional and no-evidence motion for summary judgment on all of the Rices' claims. The court granted the motion in its entirety without specifying reasons for doing so. The Rices filed their notice of this appeal.

The Trial Court's Order Granting MetLife's Summary Judgment Motion

In their first nine points, the Rices argue that the trial court erred by granting MetLife's traditional and no-evidence summary judgment motion against their various claims.

---

[4] *See* Tex. Bus. & Com. Code Ann. §§ 17.41–.63 (Vernon 2002 & Supp. 2009).

[5] *See* Tex. Ins. Code Ann. §§ 541.001–.454 (Vernon 2009).

5

Standards of review

Traditional summary judgment motions

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).

We review a summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable factfinders could and disregarding evidence contrary to the nonmovant unless reasonable factfinders could not. *Id.* We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We must consider whether reasonable and fair-minded factfinders could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

No-evidence summary judgment motions

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

Like our review of traditional summary judgment motions, when reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). And also like traditional motions, we review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded factfinders to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller*, 168 S.W.3d at 822). We credit evidence favorable to the nonmovant if reasonable factfinders could, and we disregard evidence contrary to the nonmovant unless reasonable factfinders could not. *Timpte Indus., Inc.*,

7

286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

Breach of contract

In their third point, the Rices contend that the trial court erred by granting summary judgment against their breach of contract claim. Insurance policies are contracts. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987); *see Markel Ins. Co. v. Muzyka*, 293 S.W.3d 380, 385–86 (Tex. App.—Fort Worth 2009, no pet.) (describing various principles of contract interpretation that apply to insurance policies). "The elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff." *Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 825 (Tex. App.—Fort Worth 2008, no pet.) (citing *Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 622–23 (Tex. App.—Fort Worth 2005, no pet.)).

MetLife has not expressly argued that the certificate of insurance does not qualify as a valid contract or that the Rices did not perform under that

8

contract.  Rather, MetLife moved for summary judgment on the grounds that (1) there was no evidence that it breached the contract because its termination of Larry's coverage upon Glenda's retirement was mandated by the terms of the certificate of insurance and (2) the Rices have not suffered damages.

The Rices contend that MetLife waived its termination of Larry's coverage under the certificate of insurance when it accepted premiums for two and a half years and represented in writing after Glenda's retirement that Larry had coverage.  Furthermore, they contend that the "correspondence and the associated oral and written exchanges between MetLife and [Glenda] in May of 2003 is . . . an extension of the original policy or a new contract implying the same terms."  In MetLife's motion for summary judgment, it stated, "Mistakenly, and to the benefit of Mr. Rice, MetLife kept coverage in place and continued to charge group premiums for the dependent coverage until July 2005 when the mistake was discovered."

MetLife relies on *Ulico Casualty Company v. Allied Pilots Association* to contend that coverage under the policy cannot be expanded by the waiver or estoppel doctrines.  262 S.W.3d 773, 775–87 (Tex. 2008).[6]  In *Ulico*, the

---

[6]Waiver is the intentional relinquishment of a right actually known or intentional conduct inconsistent with claiming that right; estoppel prevents one party from misleading another to the other's detriment or to the misleading party's own benefit.  *Id.* at 778.

9

Texas Supreme Court considered whether an insurer's claims-made liability insurance policy (requiring notification during the policy period to the insurer of a claim against the insured) could be extended by those doctrines to cover a suit against the insured by a third party that was filed within the policy period but was not reported to the insurer until after the policy expired. *Id.* at 775–77. In that case, although the insured had untimely reported the claim against it, the insurer reviewed the claim and sent the insured a letter stating that the insured's defense costs would be paid. *Id.* at 775–76. Thus, the insured pursued its defense, but when the insured's counsel submitted a $635,000 bill for costs incurred while defending the insured, the insurer sought a declaratory judgment to determine that it did not owe the costs under the policy. *Id.* at 776.

At the trial of the insurer's declaratory judgment case, the jury decided that the insurer had agreed to pay the insured's defense costs separately from the insurer's original policy with the insured, had waived its right to assert that the policy did not cover the costs, and was estopped from asserting that the policy did not cover the costs. *Id.* The trial court set aside the jury's finding that the insurer agreed to pay the costs apart from the policy but entered judgment as to the jury's waiver and estoppel findings. *Id.* We affirmed the trial court's judgment. *Id.* at 776–77.

In reversing our decision, the supreme court noted that when a policy covers risks for a certain time period (such as the certificate of insurance does here by ending Larry's term insurance on the date of the Glenda's retirement), "the time of the event allegedly triggering coverage is a precondition to coverage and is not considered a defensive matter to be pleaded and proved by the insurer. The insurer has neither a 'right' nor a burden to assert noncoverage of a risk or loss . . . ."[7] *Id.* at 778 (citation omitted). Then, the court explained that it had

> addressed the question of whether the contractual coverage of an insurance policy can be expanded by waiver or estoppel over seventy years ago in *Washington National Insurance Co. v. Craddock*, 130 Tex. 251, 109 S.W.2d 165 (Tex. 1937). In that case, Craddock, the insured, was entitled to weekly indemnity payments if he became incapacitated from an accidental injury. The policy specifically excepted gunshot wound injuries from coverage. Craddock accidentally shot himself with a pistol, submitted a claim, and the insurer started paying weekly benefits. After making eleven payments, the insurer stopped paying because the injury was not covered. Craddock sued. In his pleadings Craddock acknowledged that the policy specifically excepted injuries from gunshot wounds from coverage. Craddock claimed that he told the company's agent and filed his claim showing he

---

[7]The Rices have asserted that MetLife's failure to exercise its option to terminate the policy upon Glenda's retirement, its written affirmation of coverage two months after Glenda's retirement, and its acceptance of premiums for over two years amounted to a waiver of the option. But the certificate of insurance does not state that MetLife has an option to terminate upon Glenda's retirement; it states that "Dependent Term Insurance *will end*" upon retirement. [Emphasis added.]

11

was injured by a gunshot, yet the insurer paid weekly benefits. The issue and this Court's answer were straightforward:

> [B]ut he alleged further that the company having paid him 11 weeks' indemnity for an accidental injury produced by a gunshot wound, had waived this condition of the policy, and was therefore bound and obligated to pay him the remaining 93 weekly installments, and was estopped from denying its liability by virtue of such waiver. He alleged also that he had gone to considerable expense in securing and preparing claims and proof of injury.
>
> . . . The question presented is not whether the act of the insurance company in making payments would constitute a waiver of its right to forfeit the policy on account of some breach by the insured of its terms, but is whether a contractual liability may be created by a waiver. By its policy the insurance company did not assume any liability for the risk declared upon and no consideration moved to it after the accident for the assumption of such liability. The insured seeks to create that liability by invoking the doctrine of waiver. The doctrine cannot be made to serve that purpose.

*Id.* at 778–79 (some citations omitted).

Thus, conforming to its *Craddock* decision, the supreme court in *Ulico* held that waiver and estoppel cannot be used to rewrite an insurance policy and expand coverage. *Id.* at 781, 787; *see also Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 836 (Tex. 2009) (stating that the "law is clear that misrepresentations about insurance coverage cannot, under the doctrine of estoppel, expand coverage provided in an insurance policy"); *Tex. Farmers Ins.*

12

*Co. v. McGuire*, 744 S.W.2d 601, 603 (Tex. 1988) (op. on reh'g) (stating that waiver and estoppel "have consistently been denied operative force to change, re-write and enlarge the risks covered by a policy."). And in harmony with *Ulico*, Texas courts had previously held that an insurer's acceptance of premiums does not create coverage through the waiver or estoppel doctrines. *See, e.g., Great Am. Reserve Ins. Co. v. Mitchell*, 335 S.W.2d 707, 708 (Tex. Civ. App.—San Antonio 1960, writ ref'd) (holding that when a life insurance policy said that coverage terminated when an employee reached the age of sixty-five, the insurer's acceptance of premiums after the insured reached that age did not create coverage by waiver or estoppel).

Accordingly, under the binding precedent of *Ulico*, we cannot agree with the Rices that MetLife's acceptance of premiums or its other actions create a fact question as to whether the termination-upon-retirement clause of the certificate of insurance—the original contract between the parties—was negated or rewritten because of waiver or estoppel.[8]

---

[8]The Rices discuss the waiver and estoppel doctrines in their first point, in which they contend that the trial court erred by not applying those doctrines to this case. To the extent that the Rices rely on their discussion of waiver and estoppel in their first point to assert that their claims dependent on the parties' contract should succeed because Larry's original coverage was extended by an alteration of the certificate of insurance, we overrule the Rices' first point for the reasons discussed above.

13

The Rices also argue that MetLife should be liable for breach of the original insurance contract because it did not issue a personal policy to Larry or give Larry an application for such a policy upon the termination of his rider coverage in March 2003. The portion of the certificate of insurance relating to riders states that MetLife would "issue a personal policy of life insurance . . . to a Dependent if that Dependent applie[d] for it in writing during" the "31 day period after the date the Dependent Term Insurance on that Dependent ends" because of the employee's retirement. Although the certificate of insurance does not expressly state that MetLife must issue a personal policy apart from a timely application or even that MetLife was required to inform the Rices about their ability to apply for a personal policy, the Rices essentially contend that MetLife's giving them a fair opportunity to convert Larry's rider coverage into individual coverage is an implied term of the certificate. In a related argument, they also assert that MetLife was required to provide notice that Larry's rider coverage had been canceled because notice of cancellation was an implied term of the certificate.

We must usually look only to the written contract to determine the obligations of parties, and it is typically not proper for us to imply terms that contradict a contract's express language. *See Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 747 (Tex. 2003).

14

In other words, courts "cannot make contracts for [the] parties."

*HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) (quoting *Gulf Prod. Co. v. Kishi*, 129 Tex. 487, 493, 103 S.W.2d 965, 968 (1937)). Thus,

> A covenant will not be implied unless it appears *from the express terms of the contract* that "it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it," and therefore they omitted to do so, or "it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole *as gathered from the written instrument.*"

*Neel*, 982 S.W.2d at 888 (emphasis added) (quoting *Danciger Oil & Ref. Co. v. Powell*, 137 Tex. 484, 490, 154 S.W.2d 632, 635 (1941)); *see Fielding*, 289 S.W.3d at 850. An implied covenant "must rest entirely on the presumed intention of the parties *as gathered from the terms as actually expressed in the written instrument itself.*" *Universal Health Servs., Inc.*, 121 S.W.3d at 748 (emphasis added).

Under these standards, we cannot conclude that MetLife's giving the Rices notice of their opportunity to gain individual coverage for Larry after Glenda's retirement or sending them official notice of the cancellation of Larry's original coverage are implied terms of the certificate of insurance. As gathered from the *written instrument itself*—the certificate of insurance—and not from MetLife's actions, Larry's original coverage explicitly ended upon Glenda's retirement, and the Rices therefore had to apply for a personal policy for Larry

15

within thirty-one days after her retirement.[9]  Because the certificate of insurance particularly described these conditions, we conclude that MetLife's sending notice of the conditions after Glenda retired was neither "clearly within the contemplation of the parties" nor "necessary . . . to effectuate the full purpose of the contract."  *See Neel*, 982 S.W.2d at 888; *see also Hartland v. Progressive County Mut. Ins. Co.*, 290 S.W.3d 318, 324 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A notice of cancellation is not required when a policy expires under its own terms.").  While it may seem reasonable to require such additional notice as an implied term of the certificate of insurance under the circumstances of this case, "[i]t is not enough to say that an implied covenant is necessary in order to make the contract fair."  *Neel*, 982 S.W.2d at 889; *see Universal Health Servs., Inc.*, 121 S.W.3d at 748.

We also cannot agree with the Rices that MetLife's providing an application form for a personal insurance policy for Larry is an implied term of the original certificate of insurance.  Although the Rices question how they

---

[9]We recognize that MetLife has stated that it gave Larry an opportunity to apply for a personal policy in 2005.  In MetLife's summary judgment motion, it stated that it did so "as a courtesy."  Because the parties' original insurance contract could not be changed through waiver or estoppel to end Larry's original coverage on any date other than Glenda's retirement, MetLife was not contractually required to extend the personal policy conversion period that was conditioned on Glenda's retirement.

16

were supposed to apply for a personal policy without an "application form" that was provided by MetLife, the certificate of insurance does not require any particular form; it places the burden on the dependant to apply for a personal policy "in writing" during the application period. The Rices have not cited any authority holding that an insurance company has an implied contractual duty to supply an "application form" in a similar circumstance.

For all of these reasons, we overrule the Rices' third point to the extent that their breach of contract claim rests on a breach of the original certificate of insurance; we conclude that the Rices have not presented more than a scintilla of evidence to support that claim.

On the other hand, we conclude that the evidence creates a genuine fact question regarding whether MetLife breached a new, separate agreement regarding Larry's coverage. As we have explained,

> Under Texas law, the requirements of a valid contract are: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. Consideration is also a fundamental element of a valid contract.

*Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App.—Fort Worth 2004, pet. denied) (citation omitted); *see Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) ("For a contract to exist, there must be an offer,

17

acceptance, and consideration."); *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Amarillo 2008, pet. denied).

To determine whether an offer and acceptance and thus a "meeting of the minds" occurred, we use an objective standard, "considering what the parties did and said, not their subjective states of mind." *Domingo*, 257 S.W.3d at 39 (citing *Komet v. Graves*, 40 S.W.3d 596, 601 (Tex. App.—San Antonio 2001, no pet.)); *see Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 568 (Tex. App.—Fort Worth 2008, pet. denied); *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("Unexpressed subjective intent is irrelevant."). "[V]aluable and sufficient consideration for a contract may consist of either a benefit to the promisor or a loss or detriment to the promisee. Thus when a promisee acts to his detriment in reliance upon a promise, there is sufficient consideration to bind the promisor to his promise." *Jennings v. Radio Station KSCS*, 708 S.W.2d 60, 61 (Tex. App.—Fort Worth 1986, no writ); *see Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied), *cert. denied*, 130 S. Ct. 2061 (2010).

In *Ulico*, the supreme court upheld the trial court's decision to disregard the jury's determination that the parties had entered into a separate agreement for the payment of the insured's defense costs. *Ulico*, 262 S.W.3d at 789–90.

The supreme court reasoned that there was no consideration for such a separate agreement; the insured did not present any evidence that the insurer received a benefit in exchange for continuing payment of the costs or that the insured suffered a detriment by undertaking an obligation, surrendering a legal right, changing whether it would have paid the costs based on the insurer's representation that it would pay them, or otherwise acting in a different way because the insurer agreed to pay the costs. *Id.*

Unlike in *Ulico*, the Rices suffered a detriment because Glenda continued to pay premiums for Larry's coverage for more than two years while relying on MetLife's representations that he had coverage, and she averred in her affidavit that because of "MetLife's cancellation of the policy after 2½ years and the state of [Larry's] health," she was unable "to now obtain coverage" for him. Also, MetLife received the premiums and kept them for several years although it eventually repaid them.[10] Thus, reviewing the record in the light most favorable to the Rices, we conclude that the evidence raises a genuine issue of

---

[10]*Craddock* is likewise distinguishable because in *Craddock*, the insured did not argue that a new contract had been created but only that the coverage of his contract with the insurer had been changed by waiver, and the supreme court stated that "no consideration moved" to the insurer after the gunshot accident for an assumption of liability. 130 Tex. at 252–55, 109 S.W.2d at 165–67. Similarly, the insured in *Mitchell* relied only on waiver and estoppel and did not contend that a new contract had been created. 335 S.W.2d at 707.

material fact about whether the Rices gave consideration for a new agreement with MetLife regarding Larry's coverage.

Similarly, we also hold that the evidence raises a genuine issue of material fact on the remaining elements of the formation of a new contract and on a breach of that contract. The evidence, when viewed objectively rather than subjectively (in other words, when looking at what the parties actually said in their 2003 exchanges and disregarding MetLife's 2005 contention that it was merely mistaken when it represented that Larry maintained coverage), presents a genuine fact issue on offer, acceptance, meeting of the minds, and delivery of the contract with the intention that it be mutual and binding. Particularly, the evidence shows the following: (1) in May 2003, MetLife sent a letter to Glenda that gave her the option of continuing her coverage,[11] (2) Glenda responded to the letter by informing MetLife that she wanted to retain the coverage, (3) MetLife's employee, Summer, told Glenda that the coverage "would neither lapse nor be cancelled," (4) Glenda paid premiums for her own

---

[11]MetLife relies on the fact that the option that Glenda chose in response to MetLife's May 2003 letter stated, "CONTINUE MY GUL COVERAGE." But we conclude that MetLife's letter may reasonably be read to also give Glenda the option of continuing Larry's coverage because the top right-hand corner of the letter specifically showed that his coverage was still effective, the letter told Glenda that her "current coverage [would] remain effective," and it stated she would continue to pay the same premium rates (which included Larry's premium) as she had when she was employed with Avon.

20

coverage and for Larry's coverage multiple times after May 2003, and (5) MetLife responded by sending a report to Glenda that confirmed Larry's coverage.

Also, the evidence creates a genuine fact issue on a breach of the new, separate contract and resulting damages because MetLife later stopped billing for Larry's premiums and told Glenda that Larry did not have coverage, and Glenda could not obtain other coverage for Larry after the cancellation of the policy. *See El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (op. on reh'g) (explaining that a repudiation of a contract comprises a breach of it); *Bumb v. InterComp Techs., L.L.C.*, 64 S.W.3d 123, 125 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (same).

For these reasons, indulging every reasonable inference in the Rices' favor, we hold that the trial court erred by granting MetLife's no-evidence summary judgment motion against the Rices' breach of contract claim because there is more than a scintilla of probative evidence to support the Rices' theory that MetLife breached a new agreement regarding Larry's coverage.[12]

---

[12]We note that MetLife's brief indicates its belief that the parties had the authority to enter into a new agreement for coverage after the coverage originally terminated upon Glenda's retirement. Specifically, MetLife concedes in its brief that "[a]lthough [Glenda's] retirement date was in 2003 and [Larry's]

21

*See Smith*, 288 S.W.3d at 424; *Sudan*, 199 S.W.3d at 292. Thus, we sustain the Rices' third point to the extent that it rests on their argument that MetLife breached a new contract for the coverage.

Duty of good faith and fair dealing

In their second point, the Rices claim that the trial court erred by granting summary judgment against their bad faith (breach of the duty of good faith and fair dealing) claim. Texas courts have long recognized a common law duty of good faith and fair dealing in insurance relationships. *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 722 (Tex. App.—Fort Worth 2003, no pet.); *see Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). An insurer breaches the duty of good faith and fair dealing when it "wrongfully cancels an insurance policy without a reasonable basis" and the insurer "knew or should have known of that fact." *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 283 (Tex. 1994) (explaining that the "insurer's ability to unilaterally cancel an insurance policy and the insured's inability to prevent cancellation demonstrates a great disparity in bargaining power between the two parties"); *see Columbia Universal Life Ins. Co. v. Miles*, 923

---

right to convert the group dependent life coverage to an individual policy had expired . . ., MetLife extended the conversion option."

22

S.W.2d 803, 811 (Tex. App.—El Paso 1996, writ denied); *Hopkins v. Highlands Ins. Co.*, 838 S.W.2d 819, 827 (Tex. App.—El Paso 1992, no writ).

The Rices contend that MetLife is liable for bad faith because it canceled Larry's coverage retroactively in 2005 when there was no reasonable basis for the cancellation and initially refused to refund premiums. We have held that the evidence raises a genuine fact issue about whether the parties formed a contract in May 2003 that gave Larry new coverage. Accordingly, we conclude that there is more than a scintilla of evidence that MetLife wrongfully canceled Larry's new coverage without a reasonable basis and knew or should have known of that fact. The evidence shows that MetLife told Glenda that her coverage would neither lapse nor be canceled, continued to accept premiums for Larry's coverage for over two years, confirmed to the Rices after 2003 through a Group Universal Life Report that Larry still had coverage, and then canceled the coverage while telling her that it was in place through July 2005 (which is inconsistent with MetLife's claim that the coverage expired in March 2003 upon Glenda's retirement and that Larry did not obtain new coverage through the parties' communications).

We conclude that a genuine issue of material fact exists to preclude the trial court's decision to grant summary judgment against the Rices on their bad faith claim. We therefore sustain the Rices' second point.

23

Promissory estoppel

In their fourth point, the Rices argue that the trial court erred by granting summary judgment against their promissory estoppel claim.[13] The Rices alleged in their petition that by "continuing to accept premium payments . . ., [MetLife] promised [the Rices] that [MetLife] would continue to provide insurance as long as the premiums were paid." They also asserted that they relied on MetLife's alleged promise by continuing to pay the premiums and by not seeking alternate insurance for Larry. MetLife moved for summary judgment against the Rices' promissory estoppel claim on the ground, among others, that it did not make any promise that Larry's coverage would last forever. The Rices responded by directing the trial court to, among other documents, MetLife's May 10, 2003 letter.

Although estoppel based on an insurer's misrepresentations may not be used to expand coverage contractually, an insurer's actions can result in it being estopped from refusing to "make its insured whole" for "any damages [the insured] sustains because of the insurer's actions." *Ulico*, 262 S.W.3d at 782, 787. "If a promisee has reasonably and detrimentally relied on an

---

[13]MetLife did not expressly label its summary judgment motion as to the Rices' promissory estoppel claim as traditional or no-evidence. We will treat the motion as a traditional motion because a no-evidence motion must specify the elements of a claim for which there is no evidence. *See* Tex. R. Civ. P. 166a(i).

24

otherwise unenforceable promise, he may have a cause of action for promissory estoppel." *MCN Energy Enters., Inc. v. Omagro de Colombia, L.D.C.*, 98 S.W.3d 766, 774 (Tex. App.—Fort Worth 2003, pet. denied); *see In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) (orig. proceeding) (explaining that when "a promisor induces substantial action or forbearance by another, promissory estoppel prevents any denial of that promise if injustice can be avoided only by enforcement").

"The elements of promissory estoppel are: (1) a promise,[14] (2) foreseeability of reliance on the promise by the promisor, and (3) substantial detrimental reliance by the promisee." *Hubbard*, 138 S.W.3d at 482; *see MCN Energy Enters., Inc.*, 98 S.W.3d at 774. Although promissory estoppel is normally a defensive theory, it may serve as a substitute for an unsuccessful breach of contract claim. *See Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965); *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 163 (Tex. App.—San Antonio 2008, pets. denied).

We have held that the Rices' breach of contract claim, to the extent that it rests on MetLife's breaching the certificate of insurance and does not rest on

---

[14]A "promise" is a "manifestation of an intention to act . . . in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." Black's Law Dictionary 1332 (9th ed. 2009).

25

MetLife's breaching a subsequent contract between the parties, cannot succeed as a matter of law because despite MetLife's actions, Larry's coverage under the certificate of insurance was not extended past Glenda's retirement. Because there was no contract for Larry's original coverage under the certificate of insurance past March 2003, promissory estoppel may apply to MetLife's representation of that coverage if a factfinder determines that the parties did not later enter into a new contract for the coverage. *See Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 636 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) (stating that "Texas courts have held that promissory estoppel becomes available to a claimant only in the *absence* of a valid and enforceable contract"); *Secure Comm, Inc. v. Anderson*, 31 S.W.3d 428, 431 n.3 (Tex. App.—Austin 2000, no pet.) ("[P]romissory estoppel and breach of contract may be mutually exclusive causes of action."); *see also Wheeler*, 398 S.W.2d at 94, 97 (holding that a plaintiff could recover on a promissory estoppel theory when pled as an alternative to breach of contract).

MetLife's letter to Glenda represented under a heading of "Coverage Information" that as of May 10, 2003, the face amount of Glenda's "Spouse Term" coverage was $50,000. The letter notified Glenda, "[Y]our current coverage will remain effective while you assess your choices," and it told her that MetLife wanted to "keep a promise" that it had made to her.

26

Glenda's affidavit says that about three weeks after the date of MetLife's letter, MetLife's employee, Summer, told Glenda that her coverage on the policy would neither lapse nor be canceled. It also explains that Glenda "regularly received bills from MetLife entitled 'Group Universal Life Payment Notice' and a 'Group Universal Life Report' both stating the $50,000 coverage for [Larry] was included." Glenda submitted the 2005 "Group Universal Life Report" as evidence; that report, under the heading of "Beginning Values 12/31/04," states, "Spouse Rider Face Amount: 50,000.00."

We conclude that when viewed in the light most favorable to the Rices, this evidence creates a genuine issue of material fact as to whether MetLife made a promise to continue Larry's coverage and whether it was foreseeable to MetLife that the Rices would rely on that promise. *See* Tex. R. Civ. P. 166a(c). Although MetLife argues that the language related to the four insurance options that were presented to Glenda in May 2005 on the election form concerns only Glenda's coverage and does not explicitly mention Larry's coverage, for the reasons stated above, we conclude that a genuine fact issue exists as to whether MetLife represented that both Glenda's and Larry's

27

coverage would be extended if she chose the first option that was labeled "CONTINUE MY GUL COVERAGE."[15]

MetLife argues that the Rices' promissory estoppel claim fails because Glenda was deemed to know the terms contained in the certificate of insurance, including the term that Larry's coverage ended upon her retirement. We have noted that a named insured is presumed to have read its policy and to know the policy's contents. *Jenkins v. State & County Mut. Fire Ins. Co.*, 287 S.W.3d 891, 897 (Tex. App.—Fort Worth 2009, pet. denied). However, the Texas Supreme Court has held that this presumption may be overcome by proof that the insured did not know the policy's contents when it was accepted. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976) (quoting *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 355 (Tex.1965)); *see Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 476 (Tex. App.—Corpus Christi 2008, pet. denied); *Union Nat. Bank of Little Rock v. Moriarty*, 746 S.W.2d 249, 250–51 (Tex. App.—Texarkana 1987, writ denied) (explaining

---

[15]MetLife does not expressly challenge the reliance element in the portion of its brief related to the Rices' promissory estoppel claim; we will address the Rices' reliance on MetLife's representation of Larry's coverage below when we analyze the trial court's decision to grant summary judgment on some of the Rices' other claims.

that an "insured is allowed to rely on the knowledge and expertise of the insurer").

The evidence shows that the Rices paid premiums for Larry's coverage for over two years after Glenda retired and that Angelica Ridge had to explain to Glenda in 2005 that Larry no longer had coverage because Glenda thought that a quarterly bill's omission of a premium charge for his coverage "was a mistake." Viewed in the light most favorable to the Rices, this evidence creates a genuine fact issue as to whether the Rices had knowledge of the term of the certificate of insurance that caused Larry's original coverage to expire. Therefore, we cannot agree with MetLife that for summary judgment purposes, the Rices are deemed to know the contents of their policy or that their promissory estoppel claim must fail on that basis.

We also agree with the Rices' statement that under the circumstances in this case, it would be unreasonable to charge them with knowing and following the terms of the certificate of insurance when MetLife, which issued the certificate, did not even follow its own terms for over two years by continuously accepting quarterly premiums for Larry's coverage after Glenda's retirement. Finally, even if the Rices actually knew about the term of the certificate that ended Larry's coverage upon Glenda's retirement or were charged with constructive knowledge of that term, MetLife's acts that occurred

after her retirement gave them a reason to believe that MetLife was either altering or not enforcing that term and that Larry's coverage had been extended despite the term.[16]

For these reasons, we hold that, indulging all inferences in the Rices' favor, the trial court erred by granting MetLife's summary judgment motion on the Rices' promissory estoppel claim. We sustain the Rices' fourth point.

## DTPA

In their fifth point, the Rices argue that the trial court erred by granting summary judgment against their DTPA claim. In the trial court, MetLife moved for summary judgment on that claim on the ground that there was no evidence of it.

### False, misleading, or deceptive acts or practices

The DTPA creates a cause of action when a consumer suffers from "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code Ann. § 17.46(a). Such "acts or practices" include "representing that goods or services have . . . characteristics . . . which they do not have" and "representing that an agreement confers or

---

[16]MetLife also argues in response to some of the Rices' other points that they were deemed to know the contents of their policy. For the same reasons that we decline to accept MetLife's reasoning as to the Rices' promissory estoppel claim, we also decline to do so as to those points.

30

involves rights, remedies, or obligations which it does not have or involve." *Id.* § 17.46(b)(5), (12); *see Commonwealth Lloyds Ins. Co. v. Downs*, 853 S.W.2d 104, 116 (Tex. App.—Fort Worth 1993, writ denied).

To prevail on a DTPA claim, a plaintiff must prove that the defendant's misrepresentation was the producing cause of the plaintiff's injuries. Tex. Bus. & Com. Code Ann. § 17.50(a); *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 616 (Tex. App.—Fort Worth 2006, pet. denied). Producing cause requires that the defendant's act be both a cause-in-fact and a "substantial factor" in causing the injuries. *Honaker*, 192 S.W.3d at 616. The plaintiff must also prove that it relied on the defendant's misrepresentation to its detriment. Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B).

The Rices contend that MetLife's May 10, 2003 letter, Glenda's phone conversation with Summer, and MetLife's prolonged acceptance of premiums create a genuine fact dispute about whether MetLife engaged in false, misleading, or deceptive acts because it misrepresented that all of the terms of her original insurance policy, including Larry's coverage, would be continued if she elected to do so. We agree.

MetLife's letter explicitly stated that as of May 2003, Larry had $50,000 in coverage. It then told Glenda that the "current coverage would remain

31

effective" and appeared to give her the option to continue that coverage by continuing to "pay the same rates as when [she was] an active employee." We hold that under the relevant no-evidence summary judgment standards, this evidence and the other evidence detailed above creates a fact issue about whether MetLife misrepresented the continuation of Larry's coverage, precluding summary judgment on that part of the Rices' DTPA claim.[17] *See* Tex. R. Civ. P. 166a(i); *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 700 (Tex. App.—Houston [14th Dist.] 2006, pets. denied) (op. on reh'g) (relating that an insurer's affirmative misrepresentation that creates an insured's mistaken belief about coverage may be actionable under the DTPA); *State Farm Fire & Cas. Co. v. Gros*, 818 S.W.2d 908, 912–13 (Tex. App.—Austin 1991, no writ) (holding that an insurer was liable under the DTPA for misrepresenting the terms of an insurance policy).

MetLife asserts, however, that if there was a misrepresentation, it cannot be a producing cause of the Rices' injuries and the Rices could not have detrimentally relied on it because (1) Larry had an opportunity to purchase a

---

[17]MetLife contends that the "crux of [the Rices'] claims under the DTPA is MetLife's alleged wrongful termination . . . as opposed to misrepresentations." But the Rices' appellate brief and their summary judgment response show that they base their DTPA claims on MetLife's May 2003 letter, MetLife's conversation with Glenda, and MetLife's acceptance of quarterly premium payments.

32

personal policy form MetLife in December 2005 but failed to do so and (2) the Rices' premiums for Larry's coverage have been returned to them with interest (after they filed their lawsuit).[18]   But even if we consider MetLife's evidence to support its no-evidence summary judgment motion,[19] that evidence does not conclusively establish that MetLife gave Larry an opportunity to purchase a personal policy in December 2005.  Angelica Ridge's affidavit does not indicate that she expressly told Glenda that she could purchase a personal policy for Larry.  And while the affidavit states that Angelica told Glenda in December 2005 that she would "request a conversion notice" based on Glenda's "cancelled spouse rider" and asserts that such a notice was mailed to Glenda, Glenda's affidavit states that she never received any notice of the cancellation of Larry's coverage and that Angelica told her that an agent would contact her about purchasing a personal policy but that she was never contacted by an agent.

---

[18]The parties agreed during oral argument that the premium payments have now been properly refunded to the Rices.

[19]The supreme court has held that courts may not consider evidence that is attached to a movant's no-evidence summary judgment motion unless the evidence "creates a fact question."  *Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex. 2004); *see Garcia v. State Farm Lloyds*, 287 S.W.3d 809, 816 (Tex. App.—Corpus Christi 2009, pet. denied).

33

As to MetLife's second argument, the Rices concede that MetLife has returned money equal to the premiums that they paid for Larry's coverage after Glenda's retirement. However, we conclude that the evidence presented by the Rices still creates a fact issue on detrimental reliance. Glenda's affidavit concludes by stating, "Due to MetLife's cancellation of the policy after 2½ years and the state of my husband[']s health, it is not within my family's financial means to now obtain coverage for my husband." Indulging every inference in the Rices' favor, we hold that this statement adequately relates that the passage of time associated with MetLife's allegedly wrongful acts (in which the Rices thought that Larry had coverage when he did not) deprived the Rices of the opportunity to obtain coverage elsewhere. *See Sudan*, 199 S.W.3d at 292. Thus, we hold that the statement comprises more than a scintilla of evidence of the Rices' detrimental reliance on MetLife's representation to Glenda even if, as MetLife argues, the statement does not use the words "rely" or "reliance" but instead uses the word "cancellation." *See Smith*, 288 S.W.3d at 424.

For these reasons, we conclude that the trial court erred by granting MetLife's summary judgment motion against the part of the Rices' DTPA claim that alleges that MetLife engaged in false, misleading, or deceptive acts or practices, and we sustain the Rices' fifth point to that extent.

Unconscionability

Next, the Rices assert that the trial court erred by granting MetLife's summary judgment motion against their DTPA unconscionability claim. To maintain a claim for unconscionability under the DTPA, a plaintiff must prove that it suffered from an act or practice that, to the plaintiff's detriment, took advantage of its lack of knowledge, ability, experience, or capacity to a grossly unfair degree. *See* Tex. Bus. & Com. Code Ann. §§ 17.45(5), .50(a)(3); *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) ("Unconscionability under the DTPA is an objective standard for which scienter is irrelevant."). To prove an unconscionable action or course of action, a plaintiff must show that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998).

MetLife moved for summary judgment on the Rices' unconscionability claim on a no-evidence basis. The evidence that the Rices presented, viewed in the light most favorable to them, shows that MetLife represented that Larry had coverage when the Rices did not know that he did not have coverage under the certificate of insurance, accepted premiums for the alleged noncoverage for over two years and did not properly refund them until after the Rices filed their motion for new trial, never sent the Rices written notice of the termination of Larry's coverage when it said that it would, told Glenda that an agent would

35

contact her about purchasing a personal policy for Larry when an agent never did so, and therefore left the Rices without an opportunity to obtain coverage for Larry through MetLife or elsewhere (unless the parties' exchanges created new coverage for Larry in May 2003). We conclude that these facts comprise more than a scintilla of evidence of unconscionability under the standard above and therefore preclude summary judgment. *See* Tex. R. Civ. P. 166a(i); *Smith*, 288 S.W.3d at 424. Thus, we sustain the remaining portion of the Rices' fifth point.

Insurance code

In their sixth point, the Rices assert that the trial court erred by granting MetLife's summary judgment motion against their insurance code claim. The Rices pled that MetLife violated chapter 541 of that code because it misrepresented "the insurance policy by making untrue statements of material fact in regard to the policy" and by failing "to disclose material facts in regard to coverage."

The insurance code creates a cause of action for damages caused by an insurer's misrepresenting the terms or benefits of an insurance policy or by an insurer's engaging in an act "specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice." Tex. Ins. Code Ann. § 541.151; *see id.* § 541.051(1). We have held that the

36

Rices provided more than a scintilla of evidence that MetLife misrepresented the terms or benefits of Larry's coverage and that the Rices' detrimental reliance on that misrepresentation caused them damages by precluding their opportunity to obtain coverage elsewhere. Thus, for the same reasons that we sustained the Rices' fifth point, we also sustain their sixth point and hold that the trial court erred by granting MetLife's summary judgment motion as to the Rices' claim under the insurance code.

Breach of fiduciary duty

In their seventh point, the Rices contend that the trial court erred by granting summary judgment against their breach of fiduciary duty claim. MetLife moved for summary judgment on the basis that there is no evidence that it had a fiduciary duty to the Rices.

Where the underlying facts are undisputed, determination of the existence and breach of a fiduciary duty is a question of law that is exclusively within the province of the court. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005). As we have explained,

> Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly. Therefore, whether such a duty exists depends on the circumstances.
>
> Fiduciary duties may arise from formal and informal relationships and may be created by contract. . . . A person is justified in placing confidence in the belief that another party will

37

act in his best interest only where he is accustomed to being guided by the judgment or advice of the other party and there exists a long association in a business relationship as well as personal friendship. *Thus, the relationship must exist prior to and apart from the agreement that is the basis of the suit.*

*Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied) (emphasis added and footnotes omitted); *see Meyer*, 167 S.W.3d at 331 (explaining that there must be a "special relationship of trust and confidence" to create a fiduciary relationship in an ordinary business transaction). An insurer does not generally have a fiduciary duty toward its insured. *See E.R. Dupuis Concrete Co. v. Penn Mut. Life Ins. Co.*, 137 S.W.3d 311, 318 (Tex. App.—Beaumont 2004, no pet.) (citing *Wayne Duddlesten, Inc. v. Highland Ins. Co.*, 110 S.W.3d 85, 96 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)); *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 301 (Tex. App.—El Paso 1996), *aff'd*, 966 S.W.2d 482 (1998); *cf. Berry v. First Nat'l Bank of Olney*, 894 S.W.2d 558, 560 (Tex. App.—Fort Worth 1995, no writ) (holding that a bank did not automatically have a fiduciary relationship with its customers and that the customers therefore had the burden to respond to the bank's summary judgment motion by providing evidence of specific facts showing a special relationship).

Glenda said in her affidavit, "I have been a customer of MetLife on several occasions throughout my life . . . ." The Rices have not directed us to any other evidence concerning their relationship with MetLife apart from the coverage at issue in this case. We hold that Glenda's sole statement in her affidavit does not constitute more a scintilla of evidence that the Rices had a special relationship of confidence and trust with MetLife to create a fiduciary relationship. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex. 1992) (explaining that "[n]either is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship"), *superseded by statute on other grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex.2002). Thus, we hold that the trial court properly granted summary judgment against the Rices' breach of fiduciary duty claim, and we overrule their seventh point.

Fraud by nondisclosure

In their eighth point, the Rices contend that the trial court erred by granting summary judgment against their fraud by nondisclosure claim. They alleged in their amended petition that MetLife had a duty to disclose the termination of Larry's coverage but did not.

Fraud by nondisclosure is a subcategory of fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). "As a general rule, a

39

failure to disclose information does not constitute fraud unless there is a duty to disclose the information. . . . Whether such a duty exists is a question of law." *Bradford*, 48 S.W.3d at 755.

The Rices asserted in the trial court that MetLife had a duty to disclose the termination of Larry's coverage under the certificate of insurance solely because the Rices allegedly had a confidential relationship with MetLife.[20] *See World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 670 (Tex. App.—Fort Worth 1998, pet. denied) (explaining that a "party has an affirmative duty to disclose where there is a confidential or fiduciary relationship"). For the same reasons as those discussed above, we hold that the evidence presented by the Rices is insufficient to raise a material fact dispute about a confidential relationship between the Rices and MetLife. Therefore, we hold that the trial court did not err by granting MetLife's summary judgment motion on the Rices' fraud by nondisclosure claim, and we overrule the Rices' eighth point.

---

[20]We have held that a duty to disclose may arise from circumstances unrelated to a confidential or fiduciary relationship between the parties. *See Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh'g). However, issues that are not presented to the trial court "shall not be considered on appeal as grounds for reversal." Tex. R. Civ. P. 166a(c); *see Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 740 n.6 (Tex. App.—Fort Worth 2005, no pet.).

40

Damages

In their ninth point, the Rices argue that the trial court improperly granted MetLife's summary judgment motion on the ground that they did not present any evidence of damages.[21]  The Rices pled that they were entitled to recover the following damages:  (1) "[l]oss of coverage under the policy amounting to $50,000," (2) "[l]oss of opportunity to obtain affordable alternative coverage," (3) "[l]oss of premiums paid to [MetLife]," and (4) "mental anguish damages."

We have held that the evidence raises a genuine fact issue about whether the parties entered into a contract in May 2003 for Larry's coverage. Accordingly, we hold that there is a genuine fact issue about whether the Rices lost the value of that coverage if MetLife wrongfully canceled it, and we sustain the Rices' ninth point to that extent.

The Rices have not responded to MetLife's contention that they presented no evidence of mental anguish damages.  Also, the Rices admit that the premiums paid for Larry's coverage have been refunded.  Thus, we overrule the Rices' ninth point to the extent that the trial court's order precludes those damage theories.  *See Haire v. Nathan Watson Co.*, 221 S.W.3d 293, 302

---

[21]MetLife moved for summary judgment on the ground that its actions did not cause damages generally; MetLife did not assert that the Rices had to present evidence of a particular amount of damages.

(Tex. App.—Fort Worth 2007, no pet.) (affirming the trial court's decision to grant summary judgment as to claims that were not challenged on appeal).

However, we conclude that the final statement in Glenda's affidavit (that because of MetLife's actions and the state of Larry's health, the Rices could not obtain alternative coverage for him) comprises some evidence of the Rices' remaining damage theory—loss of the "opportunity to obtain affordable alternative coverage." Thus, we hold that the trial court could not properly grant summary judgment on that ground.

For these reasons, we sustain the Rices' ninth point to the extent that it regards damages related to the loss of their coverage and the loss of their opportunity to obtain affordable alternative coverage. We overrule their ninth point to the degree that it relates to damages for mental anguish or the return of premium payments.

The Trial Court's Denial of The Rices' Motion for New Trial

In their tenth point, the Rices contend that the trial court erred by denying their motion for new trial based on newly discovered evidence that MetLife had deducted premiums from Glenda's cash fund account rather than correctly returning them. Whether to grant a new trial because of newly discovered evidence "is within the discretion of the trial court. To determine whether a trial court abused its discretion, we must decide whether the trial court acted

42

without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Hutson v. Tri-County Props., LLC*, 240 S.W.3d 484, 490–91 (Tex. App.—Fort Worth 2007, pet. denied) (footnote omitted). The party who seeks a new trial on the ground of newly discovered evidence must show: (1) the evidence has come to light after trial, (2) it was not owing to want of due diligence that the evidence did not come to light sooner, (3) the new evidence is not cumulative, and (4) the evidence is so material that it would likely produce a different result if a new trial were granted. *Id.* at 491.

In their motion for new trial, the Rices conceded that before MetLife filed its motion for summary judgment, its counsel had given them $2,152.17 for the apparent return of the premiums (and six percent interest) that they had paid for Larry's coverage since Glenda's retirement. But the Rices alleged that MetLife had wrongfully removed the money from Glenda's cash fund account instead of actually refunding it.[22] MetLife filed a response to the motion for

---

[22]The cash fund account—labeled by MetLife as the "Accumulation Fund"—includes money from premium payments in excess of the cost of the insurance. Glenda swore in an affidavit,

> The cash-fund account was funded with money [she] had paid in to cover future premiums, and was not at all related to prior premiums [she] had paid. It . . . became obvious to me that MetLife had taken my own money . . . and sent it to me to make

43

new trial, the trial court held an evidentiary hearing, MetLife filed a supplemental response, and the trial court denied the motion.

MetLife's supplemental response establishes that the premium payments had not been properly refunded to the Rices at the time of the trial court's summary judgment decision. However, the response shows that as of July 2009, Glenda's cash fund account had been fully and correctly replenished by MetLife to its pre-withdrawal amount.

The Rices argue that the improper refund that had occurred at the time that MetLife's summary judgment motion was filed "caused [the Rices] to not defend . . . the cause of action *Money Had and Received*, and amounted to a fraud on the court." They contend that a different result would occur because the trial court "would be able to judge the case without considering the false affidavits" of MetLife that stated that the premiums had been properly refunded.

---

me believe that they had actually refunded the premiums . . . .

. . . .

. . . In short, I had to pay MetLife for life insurance that MetLife says never existed, and then I had to pay myself for the refund of my premiums.

44

We cannot agree with the Rices' assertion that their newly discovered evidence is so material that it would likely produce a different result. As to the Rices' money had and received claim, which is based solely on the nonreturn of the premium payments for Larry's coverage, the evidence established that at the time the trial court denied the Rices' motion for new trial, those payments had been correctly refunded to them. Thus, the Rices would not be able to obtain a different result on that claim. *See Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.) ("Money had and received is an equitable action that may be maintained to prevent unjust enrichment when one person obtains money, which in equity and good conscience belongs to another.").

Similarly, as to the Rices' other claims, if the trial court based all or part of its decision to grant MetLife's summary judgment motion on the fact that MetLife had correctly refunded the premium payments, its decision was not likely to change. By the time the trial court denied the Rices' motion for new trial, those payments had been correctly refunded. Finally, although the Rices assert that MetLife perpetuated a fraud on the court, MetLife's supplemental response to the Rices' motion for new trial shows that MetLife's delay in correctly refunding the premium payments was caused by inadvertent computer errors.

For these reasons, we hold that the evidence that the Rices attached to their motion for new trial is not so material that it would likely produce a different result if a new trial were granted and that the trial court therefore did not abuse its discretion by denying the motion. *See Hutson*, 240 S.W.3d at 490–91. We overrule the Rices' tenth point.

## Conclusion

Having overruled the Rices' first, third (in part), seventh, eighth, ninth (in part), and tenth points, we affirm the trial court's summary judgment order to the extent that it grants MetLife's summary judgment motion as to (1) the Rices' breach of contract claim concerning their theories about the breach of the certificate of insurance that created Larry's original coverage, (2) the Rices' claims for breach of fiduciary duty and fraud by nondisclosure, and (3) the Rices' damage theories of loss of premiums and mental anguish. However, having sustained the Rices' second, third (in part), fourth through sixth, and ninth (in part) points, we reverse the trial court's order to the extent that it grants MetLife's summary judgment motion as to (1) the Rices' breach of contract claim as limited to their theory about the breach of a new, separate agreement for Larry's coverage beginning in May 2003, (2) the Rices' bad faith, promissory estoppel, DTPA, and insurance code claims, and (3) the Rices' damage theories regarding their loss of coverage and loss of opportunity to

46

obtain alternate coverage.  As limited to the portions of the trial court's order that we reverse, we remand this case for further proceedings.


                                        TERRIE LIVINGSTON
                                        CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  August 31, 2010