02-10-044-CV















 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00044-CV

 

 


 
 
 Victor Catalanotto
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Meador Oldsmobile LLC f/k/a Meador
 Oldsmobile Inc.
 
 
  
 
 
 APPELLEE 
 
 


 

 

------------

 

FROM THE
96th District Court OF Tarrant
COUNTY

------------

MEMORANDUM
OPINION[1]

----------

I. 
Introduction

          In five issues, Appellant Victor
Catalanotto appeals the trial court’s judgment on the jury’s verdict in favor
of Appellee Meador Oldsmobile LLC F/K/A Meador Oldsmobile Inc.  We affirm.

II.  Factual and Procedural History

          Catalanotto worked for Meador
Oldsmobile for over twenty-three years; he worked as the dealership’s general
manager for the last twelve or thirteen of those years.  Catalanotto sued Meador Oldsmobile for breach
of contract, specifically, his entitlement to around $75,000 in severance pay,[2] after
the dealership closed.

A. 
Background

          Before Moorman Meador, Meador
Oldsmobile’s president and owner, became physically unable to run the
dealership, General Motors announced that it would stop producing Oldsmobiles.  Moorman put everything into a revocable trust
while he sought alternatives to the dealership’s demise and named Taylor Gandy
and Max Spillar co-trustees.  Gandy, executor of the Moorman Meador Estate,[3] was
personally involved in running Meador Oldsmobile from November 18, 2002, to
January 2005.  Until Spillar
died, Spillar was co-trustee and then co-executor of
Moorman’s estate with Gandy.  Moorman’s
trust terminated upon his death on October 9, 2003, and funded his estate.[4]  When Moorman died, Catalanotto became the
dealership’s dealer-approved principal, a General Motors dealership operation
requirement.

          Moorman acquired a letter of intent
for a new Dodge dealership and had several discussions with Catalanotto about
it; they wanted to keep the existing group of employees together.[5]  However, on November 18, 2002, Gandy and Spillar called Catalanotto into Moorman’s office.  They explained that they were cancelling
Moorman’s plans for the new Dodge dealership and taking over the dealership
operations and Moorman’s assets because Moorman’s health was failing, and they
asked Catalanotto to stay and run the dealership.  In October 2004, the dealership began losing
money; the end of December 2004 became the target date to finish winding down
the business.

B. 
Evidence

          Gandy and Catalanotto testified in
person.  Spillar
testified by deposition, as did his wife Greta, who had worked for Moorman
since before Meador Oldsmobile opened on December 1, 1957.  Several documents were admitted in evidence.

          1.  February 21, 2003 Compensation Agreement

          Plaintiff’s Exhibit 1, a letter
agreement between Catalanotto and Moorman Meador Revocable Trust signed by
Catalanotto, Gandy, and Spillar, and dated February 21, 2003, set out the
following:

This letter will
confirm in writing the agreement that was made with you at a meeting at Meador
Oldsmobile on November 18, 2002 with Taylor Gandy, Max Spillar, Moorman Meador
and you.

 

          We requested that you remain as the
General Manager of Meador Oldsmobile, Inc. through the time 1.) that General
Motors no longer furnishes us new cars and Meador Olds discontinues operations
as a result or 2.) the stockholders of Meador Olds determine to discontinue
operations, whichever event occurs first. 
You have indicated your willingness to make this commitment.  Your duties and responsibilities would
continue to be the same as they have been in the past devoting your full time
and attention to managing the dealership to achieve maximum results consistent
with prior policies.  Your full time
would be expected and you would report to us or to our successors.

 

          During this remaining time at Meador
Oldsmobile you will be compensated at the same level using the same bonus
formula as you have received in the past.[[6]]  However, your compensation will not drop
below $12,000 in any one month or $150,000 per year even if the formula should
produce a lower compensation because of the lower volume of new car sales
during the remaining time.

 

          In addition we agree that if you
complete your commitment to Meador Oldsmobile, Inc. as outlined above and
remain until operations have ceased, Meador Oldsmobile, Inc. [w]ill pay you a
bonus of $150,000, payable in a lump sum upon cessation of operations by the
dealership.

 

          Your salary and bonus as outlined
above would be earned only upon your carrying out the policies of the Company
as we may determine from time to time. 
If you are discharged for just cause, your salary beyond such date and
your bonus would not be due and payable. 
The commitments in this letter made by each of us will not be binding on
either of us unless General Motors has ceased production of new cars no longer
than December 31, 2004.

 

          2.  November 4, 2004 Severance Pay Memo

          Plaintiff’s Exhibit 2 was a November
4, 2004 memorandum addressed to “All Employees of Meador Oldsmobile, Inc.” from
“Executors[] of Meador’s Estate” regarding “Severance
Pay.”  Defendant’s Exhibit 4, containing
the same document, included the email to which the memo was attached, also dated
November 4, 2004, sent by Gandy to Spillar and Catalanotto.  It states, “Here is a draft of the proposed
memo to the employee’s. [sic] Let me have your
comments.”  The memo set out the
following:

          This memo is intended to confirm to
each of you the severance pay plan the General Manager presented to you on
October 21, 2004.

 

          For those of you that continue working
at Meador Olds performing your assigned duties until such date as determined by
the General Manager that your services are no longer needed, you will receive
severance pay according to the following formula:[[7]]

 

          . . . . 

 

          On behalf of Mr. Meador’s Estate we
would like to express our appreciation for your many contributions over the
years.  The discontinuance of the
Oldsmobile Division of General Motors more than the death of Mr. Meador has
resulted in the closing of Meador Olds.

 

          As we wind down the business of the
Company your valuable service will continue to be important to the final days
of the Company.  If you have any
questions, please see the General Manager for clarification. 

 

          3.  Max Spillar’s Calculations

          The final document, offered by both parties,
was a set of calculations by Spillar on a printout showing
the hire date, 2003 earnings, and 2004 earnings for thirty-one
individuals.  There were handwritten calculations
beside the names of the employees, showing what each “would get applying the
bonus to them.”  Spillar
had drawn lines through Catalanotto’s earnings,[8] and
there was no handwritten amount of severance by Catalanotto’s name.

          4.  Taylor Gandy’s Testimony

          Gandy described the company’s chain of
command as employees reporting to managers, who reported to the general manager
(Catalanotto), who reported to Gandy and Spillar.  He, Catalanotto, and Spillar had regular
meetings.  Gandy stated that neither he nor
Spillar had any experience running a car dealership and that the February 21,
2003 compensation agreement’s main purpose was to keep Catalanotto—who was key to the business’s continued profitability—at the
dealership.  With its extra $150,000 and
salary floor added to Catalanotto’s existing pay, the agreement was set up to
ensure that Catalanotto would stay until the dealership stopped receiving
Oldsmobiles—that is, “[t]o ensure that Victor [didn’t] get another job and
leave us high and dry.”  Gandy stated
that the idea of a minimum level of compensation was Catalanotto’s.  Gandy acknowledged that, at the time the
compensation agreement was signed, there was no plan for severance for any of
the employees.

Sometime before October 21, 2004, Gandy, Spillar,
and Catalanotto discussed a severance plan for the employees; Catalanotto was
involved in the severance plan’s creation from the
beginning.  The three men devised and
developed it over “quite a few different meetings” and over many weeks, and its
main purposes were “to incentivize the employees to stay and continue working
for Victor in a new dealership if he got one.” 
Additionally, taking care of the employees was something Meador would
have wanted, and the plan was a reward for longevity with the company.

          Catalanotto called a meeting on
October 21, 2004, and presented the severance plan to the employees.  Gandy stated that he and Spillar had not
discussed when Catalanotto was going to make the announcement and that
Catalanotto made the announcement without Gandy knowing.  While Catalanotto had the authority to do this,
Gandy wished it had been done differently because he had wanted to be present
and he assumed, but did not know, that Catalanotto had told the employees about
the severance plan like they had discussed.  To avoid any misunderstandings about the
severance arrangements, Gandy drafted the November 4, 2004 memo.  Gandy sent an email to Catalanotto and Spillar
with the draft memo attached and asked for their comments, and Catalanotto
called him and told him to add a sentence about “if you’re terminated for just cause you’re not going to receive severance.”  The draft was never finalized or given to the
employees.[9]  Gandy agreed that the actual severance
agreement with the employees was entered into on October 21, 2004.

          Gandy stated that when he addressed
the memo to “all employees,” he did not intend to include Catalanotto as an
employee “because the three of us had devised that plan, and it was never our
intention—and I don’t think it was Victor’s intention—that he be included in
that plan.”  He did not consider
Catalanotto an employee for purposes of the memo, although he acknowledged that
it could be read either way.  Specifically,
he explained that in the last paragraph of the November 4, 2004 memo, “you” was
a reference to all of the employees except Catalanotto, because Catalanotto was
the general manager and was in a different category, even though he was also an
employee.

Gandy admitted that he never told Catalanotto “in
so many words” that he would not be eligible for the severance plan, and he stated,
“I should have said something different than I did in the memo.  It was just a draft.  But I don’t think I misled anybody, including
Victor.”  Catalanotto “well knew that he
was not intended to be included” in the severance plan “because of the
many hours of discussion that we had had about how we were going to compensate
the other employees.  Never once did we
ever say Victor was going to be included.”  After Gandy emailed the draft, Catalanotto
never called to ask if he was included in the severance plan.

          Gandy acknowledged that Catalanotto
was an employee and that there was nothing in the severance pay memo that would
preclude him from receiving severance pay, but he also stated that he thought
the $150,000 Catalanotto received was in lieu of, or could be construed as
including, severance pay.  And he stated
that Catalanotto should not receive two payments; that is, because Catalanotto
had the February 21, 2003 compensation agreement, he should not also be
eligible to receive severance pay under the severance agreement.  On cross-examination, Gandy gave the following
testimony:

          Q. 
Looking at this paragraph down here [in Plaintiff’s Exhibit 1] with the
$150,000 payment in it, this $150,000 was to be paid to Mr. Catalanotto after
operations have ceased—it was to be paid upon cessation of operations by the
dealership:  is that correct?

 

          A. 
That’s correct.

 

          Q. 
And when the dealership operations ceased, what was going to happen to
Mr. Catalanotto’s employment?

 

          A. 
Well, everybody, including Victor, was hopeful that he could land a new
dealership and all of the employees would be employed by Victor in new a [sic]
dealership.  And that was the hope of
everybody.

 

          Q. 
That was the hope at that time. 
What was going to happen to his employment at Meador Olds, though?

 

          A. 
Well, it would cease.

 

          Q. 
Okay.  He would be terminated,
right?

 

          A. 
Yes.

          Q. 
And he’s going to get paid $150,000 upon the termination of his
employment with Meador Olds?

 

          A. 
That’s correct.

 

Gandy
stated that the $150,000 payment seemed to fit within the definition of
“severance” and that he would treat it as a severance bonus.[10] 

          Finally, Gandy explained that the
severance plan did not apply to Catalanotto

[b]ecause the idea
for the severance really originated out of several meetings that Max [Spillar]
and Victor and I had.  And those
discussions [re]volved around maintaining profitability of Meador Oldsmobile.  And Victor made the point, which was a good
point, that it’s going to be hard to maintain profitability if he starts losing
employees.  And I agreed, and so did
Max.  We all agreed.  And he also said, you know, “If we get an
opportunity to have another dealership, it would be nice to have everybody
still working at Meador Oldsmobile.”  And
I agreed with that.  So it was in that
context that we decided to come up with a plan that would apply to all the
other employees.  It was never discussed,
ever discussed, that Victor would be included in that severance plan.  It was really designed to assist Victor and
his employer to maintain profitability.

 

          Gandy testified that Catalanotto
received a copy of Spillar’s calculations because they had discussions with him
to make sure that it was accurate and that he was in agreement with it.  Catalanotto never asked them why his earnings
had been lined out or why there were no handwritten numbers beside his name.  To the contrary, Catalanotto objected to the
amount Randy Courtney was to receive—which had been approximately $7,000
originally and which was increased to $15,000—because he needed him at the
dealership, did not want him to leave, and did not think $7,000 was enough to
keep him there until the end.

          Catalanotto called Gandy in April 2005
about a problem with a payment from the used-car lot.  In the two or three phone calls he received
from Catalanotto between March and April 2005, Catalanotto never mentioned
anything to Gandy about not being paid severance under the severance plan prior
to the March 2007 demand letter from his attorney.  Gandy stated he did not recall Catalanotto telling
him that he would sue for his severance pay as well as the used car bonus.

          5.  Max Spillar’s Testimony by Deposition

          Spillar testified that he and Gandy
came up with the severance plan and payout calculations in the last quarter of
2004 to retain the employees until they were no longer needed, to reward them
for good service, and to let them share in the company’s overall goodwill.  There was no written memo about the severance
plan, and once he and Gandy came up with the plan, they reviewed it with
Catalanotto.  Spillar
also told his wife Greta about it, and she communicated it to the dealership’s
office employees.

          Catalanotto asked if he could
communicate the plan to the employees, and they said he could tell the shop and
sales employees about it.  Spillar was not present when Catalanotto told the employees
about the severance plan.

          6.  Greta Spillar’s Testimony by Deposition

          Gandy and Greta’s husband came up with
the severance plan and told Greta about it.  She did not know when Catalanotto told the
employees about the severance plan but said that it could not have been in
October 2004 because her husband did not create the computation schedule until
the middle of December 2004, and the severance plan was not communicated to the
employees until December 2004, when her secretary printed up the computation
schedule and her husband calculated the amount of severance pay.  She never saw a memo setting out the severance
plan.  Her husband gave the computation
schedule to her and her secretary to write the checks for the amounts
indicated.  She first became aware that
Catalanotto had expected to receive severance pay when Gandy called her and
said they were being sued.

          7.  Victor
Catalanotto’s Testimony

          Catalanotto agreed that Gandy and
Spillar backloaded the 2003 compensation agreement to keep him there until the
end and that he asked Gandy to put the agreement in writing.  Plaintiff’s Exhibit 1 is the final draft of
the agreement.

          Prior to Moorman’s death, Catalanotto initially
met with Gandy and Spillar once a month and later with increasing frequency.  Spillar would go
over the financial statement and ask questions and Catalanotto would update
them on his progress in finding a new dealership.  At one of their meetings in early fall 2004, Gandy
and Spillar told him that they were going to devise a
severance package for all of the employees.  He was ecstatic, both for himself and “also
for the employees.”  He stated that Spillar was supposed to be working on the plan because, in a
subsequent meeting, Gandy asked Spillar, “Have you got that stuff together on
the severance yet?”  And Spillar said,
“No, not yet.  I’m working on it.”

          When Gandy and Spillar first told him
about the severance plan, they told him that they were going to decide what
they would pay out, and the formula was discussed later.  They told him what the formula would be in a
meeting on October 21, 2004.  He asked
them if he “could go back and tell all the employees” about it,
and they said he could.  He immediately
went back and explained the plan to the employees.[11]  He did not announce the plan to the office
staff—Greta’s staff—because they already knew about it.

          Catalanotto stated that in all of the
meetings, neither Gandy nor Spillar ever told him that
he would not be included in the severance plan and that no one at Meador
Oldsmobile ever told him that he was not intended to be included in it.  He had no reason at all to believe that he
would not be included in the severance plan and believed that he would be
included.  However, he admitted on
cross-examination that he had never specifically discussed with Gandy or
Spillar whether the severance plan applied to him. 

          Gandy emailed the severance plan memo
to Catalanotto and Spillar on November 4, 2004, asking
if they had any comments.  Catalanotto
replied, “[I]n line 7, we needed to put a clause in there that if they’re fired
for just cause they would not collect severance.”  He never received a revised copy of the memo.

          On January 20, 2005, Spillar told Catalanotto, “We no longer need your services,”
and Greta handed him an envelope.  Catalanotto
opened the envelope when he arrived home, looked inside, and thought, “Okay,
where’s the other check?”  His check for
his work from January 1, 2005, to January 20, 2005, was in the envelope, as was
his bonus check for $150,000, but there was no severance check.  He thought that there was a mistake, so he
went back to the office the next day.  He
told Greta that he had not received his severance check, and she looked at him
and said, “You got all the money you’re going to get.”

          The next time Catalanotto spoke with
Gandy was at the end of March.  During
his first two phone calls, Catalanotto only discussed his pay dispute with the
used car lot.  In his third call, Catalanotto
told Gandy, “If you’re not going to pay me on the [used car] lot, then I guess
I’m going to have to sue for that and also for my severance pay.”  Gandy replied, “Well, I thought we took care
of that already with you with that $150,000.”  Catalanotto told Gandy that the $150,000 was
his bonus check.  On cross-examination,
Catalanotto gave the following testimony:

          Q. 
So you thought you were entitled to severance, [Gandy] thought the
$150,000 was your severance.  That was
clear from that conversation, wasn’t it?

          A. 
Okay.  

 

          Q. 
So you have to agree with me then that your mind and his mind didn’t
meet on that issue, did they?

 

          A. 
That’s correct. 

 

          Q. 
Okay.  And let’s talk about what
Max Spillar thought.  Max Spillar filled
out the form with all the names on it, and he left a blank by your name; isn’t
that right?

          

          A. 
Apparently, yes.

 

          Q. 
Yeah.  And when he instructed
Greta to cut checks, there was no check cut for you, was there?

 

          A. 
No, there was not.

 

          Q. 
And we know that Max is dead now, he’s not here to testify.  But just looking at those two facts, you’ll
agree with me that in his mind you weren’t entitled to payment under that
severance plan too, won’t you?

 

          A. 
I’ll agree he had no intention of paying me the severance.

 

          Q. 
Right.  So there was no meeting of
your mind and his on severance either, was there?

          

          A. 
There was a meeting of the minds of the severance for all employees.

 

          Q. 
Yeah.  Let me rephrase the
question.  There was no meeting of your
mind and his as to whether or not you were going to get paid severance under
that plan, was there?

          

          A. 
My name specifically, no. 

 

Catalanotto
admitted that, although he and Gandy had had a good relationship as business
friends, he did not call, write, or email Gandy the day after he received his
checks to ask about the severance check.  And he admitted that the deciding factor for
how long he would stay at Meador Oldsmobile was not the severance plan but
whether someone offered him a lot of money to go elsewhere.

C. 
Procedural Posture

          The jury found in favor of Meador
Oldsmobile on jury question #1—a contract formation question—and the trial
court entered a take-nothing judgment against Catalanotto.  Catalanotto filed a motion for judgment notwithstanding
the verdict (JNOV), asking the trial court to disregard the jury’s finding on
jury question #1 because the question pertained to a question of law for the
court to decide, and he filed a motion for new trial, raising complaints about the
legal and factual sufficiency of the evidence to support the jury’s answer to
jury question #1, error in the jury charge, and statements in defense counsel’s
closing argument.  The trial court denied
both motions, and this appeal followed. 

III.  Preservation of Error

          In his first issue, Catalanotto argues
that the trial court erred by submitting a contract-formation question to the
jury because the contract in question was unambiguous.  In his second issue, he complains that the
trial court abused its discretion by allowing the admission of extrinsic
evidence of unexpressed subjective intent to contradict the contract’s express
terms.

          With regard to jury question #1,
Catalanotto filed the following proposed jury question:

 

PLAINTIFF’S PROPOSED
QUESTION NO. 1

QUESTION

Did Meador Oldsmobile
LLC f/k/a Meador Oldsmobile, Inc. and Victor Catalanotto agree that Meador
Oldsmobile LLC f/k/a Meador Oldsmobile, Inc. would pay Victor Catalanotto
“severance pay” (as defined by the November 4, 2004 memo regarding severance
pay[)].

 

In deciding whether
the parties reached an agreement, you may consider what they said and did in
light of the surrounding circumstances, including any earlier course of
dealings.  You may not consider the
parties’ unexpressed thoughts or intentions.

 

          Answer “Yes” or “No” 

          The actual question submitted in the
jury charge asked,

Question No. 1:

          Did Victor Catalanotto and Meador
Oldsmobile, Inc. (now known as Meador
Oldsmobile, L.L.C.) agree that Victor Catalanotto was to be included in the
November 4, 2004, Severance Pay Plan?

 

          Business organizations, by their
nature, cannot act without human agents. 
Business organizations act by and through their officers, employees, and
agents.  The actions of an individual on
behalf of a business organization are considered the business organization’s
acts.

 

          In deciding whether the parties
reached an agreement, you may consider what they said and did in light of the
surrounding circumstances, including any earlier course of dealing.  You may not consider the parties’ unexpressed
thoughts or intentions.

 

          To form a valid contract, the
parties must have the same understanding of the subject matter of the contract
and all its essential terms.

 

          Answer “Yes” or “No.”  [Underlining added.]

 

          During the charge conference,
Catalanotto objected only to the underlined language above, stating that it was
unnecessary, superfluous, and potentially a comment on the weight of the
evidence—none of which he complains about here—and the trial court overruled
his objection.

          We initially note that a party complaining
about the jury charge must have timely and plainly made
the trial court aware of the complaint and must have obtained a ruling to
preserve its error.  Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 43–44 (Tex. 2007); State Dep’t of Highways & Pub. Transp.
v. Payne, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh’g); see also Tex. R. Civ. P. 272–274.
Furthermore, when the trial court has to resolve a legal issue before the jury
can properly perform its fact-finding role, a party desiring to preserve the
issue for appellate review must lodge an objection in time for the trial court
to make an appropriate ruling without having to order a new trial.  Holland v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 94 (Tex. 1999).  And finally, a party may not invite error by
asking “something of a court and then complain[ing]
that the court committed error in giving it to him.”  Ne.
Tex. Motor Lines v. Hodges, 138 Tex. 280, 158 S.W.2d 487, 488 (1942); see also Gen. Chem. Corp. v. De La Lastra,
852 S.W.2d 916, 920 (Tex. 1993) (“Parties may not invite error by requesting an
issue and then objecting to its submission.”), cert. denied, 510 U.S. 985 (1993). 

          Here, Catalanotto specifically
requested submission of most of the component parts of jury question #1, and
the only component he objected to at trial does not match his complaint on
appeal.  See Banda v. Garcia, 955 S.W.2d 270, 272 (Tex. 1997) (noting that
the complaint on appeal must be the same as that presented in the trial court).  We hold that he has failed to preserve this issue
for our review.  See Tex. R. App. P. 33.1; Ledesma,
242 S.W.3d at 43–44.

          Likewise, although Catalanotto argues
that the trial court erred by allowing “extrinsic evidence of Defendant’s
unexpressed subjective intent that it did not intend to include [Catalanotto]
in the severance plan to contradict the express terms of a written instrument .
. . thereby supposedly creating ambiguity where there was none,” Catalanotto
himself brought out most of the controversial testimony by Gandy during his
direct examination, and he failed to object to any of Gandy’s testimony brought
out by the defense.[12]  Because Catalanotto gave the trial court no
indication that he found this evidence objectionable during trial, he has
failed to preserve this issue for our review.  
See Tex. R. App. P. 33.1(a);
Tex. R. Evid. 103; State Bar of Tex. v.
Evans, 774 S.W.2d 656, 658 n.6 (Tex. 1989); One Call Sys., Inc. v. Houston Lighting & Power, 936 S.W.2d
673, 677 (Tex. App.—Houston [14th Dist.] 1996, writ denied).  We overrule Catalanotto’s first and second
issues.

IV. 
Sufficiency of the Evidence

          In his third and fourth issues,
Catalanotto argues that the trial court erred by entering judgment on the
jury’s verdict instead of granting his motion for JNOV because the jury’s
answer to the contract-formation question was wrong, as there was no evidence
to support it.  He also argues that the
evidence was factually insufficient to support the jury’s answer.

A. 
Standards of Review

          A trial court may disregard a jury
verdict and render JNOV if no evidence supports the jury finding on an issue
necessary to liability or if a directed verdict would have been proper, i.e.,
when the evidence conclusively establishes the right of the movant to judgment
or negates the right of the opponent, or when the evidence is insufficient to
raise a material fact issue.  See Tex. R. Civ. P. 301; Tiller v. McLure, 121 S.W.3d 709, 713
(Tex. 2003); Fort Bend County Drainage
Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991); Farlow v. Harris Methodist Fort Worth Hosp., 284 S.W.3d 903, 919
(Tex. App.—Fort Worth 2009, pet. denied).

          We may sustain a legal sufficiency
challenge only when (1) the record discloses a complete absence of evidence of
a vital fact; (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4)
the evidence establishes conclusively the opposite of a vital fact.  Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, “No Evidence” and
“Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63
(1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent.
Ready Mix Concrete Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).

          When reviewing an assertion that the
evidence is factually insufficient to support a finding, we set aside the
finding only if, after considering and weighing all of the evidence in the
record pertinent to that finding, we determine that the evidence supporting the
finding is so weak, or so contrary to the overwhelming weight of all the
evidence, that the answer should be set aside and a new trial ordered.  Pool v.
Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965); In re King’s Estate, 150
Tex. 662, 244 S.W.2d 660, 661 (1951).

B. 
Ambiguity

          With regard to contract interpretation,
this court has previously stated,

          When construing contracts, our primary
concern is to ascertain the true intent of the parties as expressed in the
contract.  We must examine and consider
the entire contract in an effort to harmonize and give effect to all provisions
so that none are rendered meaningless.  “We
presume that the parties to the contract intend every clause to have some
effect.  We give terms their plain,
ordinary, and generally accepted meaning unless the contract shows that the
parties used them in a technical or different sense.”  A specific contractual provision controls
over a general provision.

 

          Lack of clarity or a disagreement
among the parties does not necessarily create an ambiguity.  Rather, whether “a contract is ambiguous is a
question of law that must be decided by examining the contract as a whole in
light of the circumstances present when the contract was entered.”  “If, after the pertinent rules of
construction are applied, the contract can be given a definite or certain legal
meaning, it is unambiguous and we construe it as a matter of law.”  But if a contract is ambiguous, then
interpretation of the contract presents a fact issue for the jury.  “When the [contract] is not ambiguous on its
face, extrinsic evidence may not be used to create an ambiguity.”

 

Clark v. Cotten
Schmidt, L.L.P., 327 S.W.3d 765,
772–73 (Tex. App.—Fort Worth 2010, no pet.) (internal citations omitted).

          The November 2004 memorandum is the
only expression of the October 21, 2004 oral contract’s terms.  Catalanotto argues that it is “not ambiguous
as to the class of persons who can accept the severance offer because it
expressly includes ‘All Employees of Meador Oldsmobile, Inc.’”  Nonetheless, the memorandum’s plain language
also appears to separate the “General Manager” (Catalanotto) from the “you”
referred to as “the employees,” specifically, in the first paragraph (referring
to the “plan the General Manager presented to you”), the second paragraph (“until such date as determined by the
General Manager that your services
are no longer needed”), and the last paragraph (“If you have any questions, please see the General Manager for
clarification.”).  [Emphases added.]

          Furthermore, the trial court and the
jury heard differing testimonies about the oral contract’s circumstances.  While all of the witnesses agreed that the
severance plan was in response to the changing conditions at Meador Oldsmobile,
Gandy stated that Catalanotto helped create the plan, while Catalanotto and
Spillar said it was presented to Catalanotto by Gandy and Spillar.  Because it is not entirely clear from the
face of the document whether the “General Manager” was in a class separate from
the employees referred to as “you,” and because the evidence conflicted about
who participated in creating the agreement, the memo is ambiguous.  Therefore, a material question of fact
existed for the jury to resolve.[13]

C. 
Meeting of the Minds

          A valid contract requires a meeting of
the minds.  Rice v. Metropolitan Life Ins. Co., 324
S.W.3d 660, 670 (Tex. App.—Fort Worth 2010, no pet.).  In determining whether mutual assent is
present, courts consider the communications between the parties, the acts and
circumstances surrounding the communications, and any course of dealing between
the parties.  Parker Drilling Co. v. Romfor Supply Co., 316 S.W.3d 68, 75 (Tex. App.—Houston
[14th Dist.] 2010, pet. filed) (citing Haws
& Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co, 480
S.W.2d 607, 609 (Tex. 1972)).  The
determination of a meeting of the minds is based on the objective standard of
what the parties said and did, not on their subjective states of mind.  Id.  This determination is a question of fact, and
the factfinder’s decision that one party reasonably drew the inference of a
promise from the other party’s conduct will be given legal effect.  Id.

          Plaintiff’s Exhibit 1, the February
21, 2003 compensation agreement signed by Catalanotto and Gandy and Spillar,
and the testimony about it, shows that Catalanotto had a separate agreement in
place before the controversial severance agreement was contemplated by anyone.  It memorialized the parties’ agreement on
November 18, 2002, between Gandy, Spillar, Moorman Meador,
and “you,” meaning Catalanotto, setting out a new floor for Catalanotto’s
compensation as general manager and agreeing to pay him an additional $150,000
bonus if he stayed as general manager until operations ended.

          As noted above, Plaintiff’s Exhibit 2,
the November 4, 2004 severance pay memo, is ambiguous with regard to whether
Catalanotto fits into the “you” of the employees or if he is held out
separately as the general manager. 
Defendant’s Exhibit 4, Gandy’s email asking for comments from Catalanotto
and Spillar, to which the memo was attached, supports Gandy’s testimony that Catalanotto
was involved in developing the severance plan from the beginning.  According to Gandy, he and Spillar never told
Catalanotto that he would be included in the plan to compensate the other
employees and to give them an incentive to stay until the end, and Catalanotto
never asked for clarification, even after receiving Spillar’s payout
calculations, which had no severance payout calculation for him. Catalanotto
admitted that he had never specifically discussed with Gandy or Spillar whether
the severance plan applied to him.  And,
according to Gandy, Catalanotto’s reason to develop the severance plan with the
co-trustees involved his interest in keeping the employees together for his
future dealership plans, an interest that was separate and apart from that of
his mutual interest with the co-trustees in maintaining the existing
dealership’s profitability. 

          The jury had the responsibility to
evaluate the witnesses’ credibility and to determine whether there was a
meeting of the minds between Catalanotto and the co-trustees.  Based on Gandy’s testimony, the jurors could
have reasonably found that there was no meeting of the minds as to Catalanotto’s
inclusion in the severance plan because Catalanotto helped develop it and
because there was no evidence presented that he had ever been told he would be
included or that he ever asked Gandy and Spillar whether he would be included
in it.  See Uniroyal Goodrich, 977 S.W.2d at 334.  We hold that the evidence is legally
sufficient to support the jury’s verdict and that the trial court did not err
by denying Catalanotto’s motion for JNOV.

          And although Spillar’s and
Catalanotto’s testimonies about only Gandy and Spillar devising the severance
plan supports Catalanotto’s theory that he was included in the plan as an
“employee,” as does Catalanotto’s testimony that no one ever told him that he
was not intended to be included in
it, the jury could have reasonably chosen to disbelieve this.  Therefore, we hold that the evidence is also
factually sufficient to support the jury’s verdict and that the trial court did
not abuse its discretion by denying Catalanotto’s motion for new trial.  We overrule Catalanotto’s third and fourth
issues.

V. 
Jury Argument

          In his fifth issue, Catalanotto argues
that defense counsel created error by twice instructing the jury to ignore the
trial court’s instructions during closing arguments.  Specifically, he complains of the following
remarks made while defense counsel discussed the jury charge with the jury:

          Now, there’s this other paragraph up here.  “In deciding whether the parties reached an
agreement, you may consider what they said and did in light of the surrounding
circumstances, including”—that “including” word—“any earlier course of
dealing.”

 

          You’re
not limited to what happened before.  You
can also include things that happened after.  This is making it clear that you can take
into account the earlier course of dealing. 
So the comments of the parties
afterwards is not something you just disregard.  [Emphasis added.] 

 

And defense
counsel subsequently restated, “In deciding whether the parties reached an
agreement, you may consider what they said and did in light of the surrounding
circumstances, including what happened before. 
Doesn’t exclude what happened
afterward.”  [Emphasis added.] 

          Generally, an objection must be made
immediately after the contested statement, or the error is waived.  Miller v. Bock Laundry Mach. Co., 568 S.W.2d 648, 653 (Tex. 1977).  However, a complaint of incurable jury
argument may be asserted and preserved in a motion for new trial, even without
a complaint and ruling during the trial. See
Tex. R. Civ. P. 324(b)(5); Phillips v.
Bramlett, 288 S.W.3d 876, 883 (Tex. 2009). 
Catalanotto raised his complaint about incurable jury argument in his
motion for new trial. 

            Control of counsel’s conduct
during jury argument rests in the sound discretion of the trial court.  Wells
v. HCA Health Servs. of Tex., Inc., 806 S.W.2d 850, 854 (Tex. App.—Fort
Worth 1990, writ denied); see also
Tex. R. Civ. P. 269.  The test for improper
jury argument is whether, based on the record as a whole, the offensive
argument was so extreme that a juror of ordinary intelligence could have been
persuaded by that argument to agree to a verdict contrary to that to which he
would have agreed but for such argument. 
See Phillips, 288 S.W.3d at 883.  Reversal is required only when the entire
record shows that the argument was improper, uninvited and unprovoked,
preserved, and incurable by instruction, withdrawal, or trial court reprimand.  See Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex.
1979).

          Incurable jury argument is rare
because “[t]ypically, retraction of the argument or instruction from the court
can cure any probable harm . . . .”  Living Ctrs. of Tex., Inc. v. Penalver,
256 S.W.3d 678, 680 (Tex. 2008).  The
burden to prove that improper argument was incurable rests on the
claimant.  Jones v. Rep. Waste Servs. of Tex., Ltd., 236 S.W.3d 401, 402 (Tex.
App.—Houston [1st Dist.] 2007, pet. denied). 
“A jury argument is ‘curable’ when the harmful effect of the argument
can be eliminated by a trial judge’s instruction to the jury to disregard what
they have just heard.  The error is
‘cured’ and rendered harmless by the instruction.”  Otis
Elevator Co. v. Wood, 436 S.W.2d 324, 333 (Tex. 1968).  And the complaining party on appeal must
explain why opposing counsel’s argument was incurable based on an evaluation of
the entire case, from voir dire to closing argument.  Arthur
J. Gallagher & Co. v. Dieterich, 270 S.W.3d 695, 707 (Tex. App.—Dallas
2008, no pet.) (op. on reh’g).

          We note initially that, contrary to
Catalanotto’s argument, the charge itself does not prohibit the jury from
considering what the parties did after
they reached their agreement.  Rather,
the charge states, “In deciding whether the parties reached an agreement, you
may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing.  You may not consider the parties’ unexpressed
thoughts or intentions.” [Emphasis added.] 

          Furthermore, Catalanotto fails to
explain why defense counsel’s argument was incurable based on an evaluation of
the entire case.  See Dieterich, 270 S.W.3d at 708 (“[T]he Company does not explain
why the arguments were incurable based on an evaluation of the whole case.  And after examining the entire record, we
cannot say that the error was so harmful that its effect could not have been
removed by a proper curative instruction.”). 
Catalanotto failed to object to the complained-of argument either time
defense counsel made it, which—if the argument were improper—would have been
curable by an instruction to the jury to disregard the argument and follow the law
as set out in the court’s charge.  See Standard Fire Ins., 584 S.W.2d at 839–41;
see also Smith v. Cox, 446 S.W.2d 52,
63 (Tex. Civ. App.—Corpus Christi 1969, writ ref’d n.r.e.) (holding no
prejudicial error when appellants complained of incurable harm but the trial
court overruled some of their objections, partially sustained others, and also
“admonished appellees’ counsel to refrain from citing
law which was not contained in the charge; several times the court instructed
the jury to consider only such law as was in the charge”); cf. Penalver, 256 S.W.3d at 681 (reciting that appeals to racial
prejudice; unsupported, extreme, and personal attacks on opposing parties and
witnesses; and accusing an opposing party of manipulating a witness without
evidence of witness tampering can all be incurable jury argument).  And based on the record before us, we cannot
say that the jury argument, if improper, was so extreme that a juror of
ordinary intelligence could have been persuaded to change his verdict because
of it.  See Phillips, 288 S.W.3d at 882–83. 
We overrule Catalanotto’s fifth issue.

VI.  Conclusion

          Having
overruled all of Catalanotto’s issues, we affirm the trial court’s judgment.

 

BOB MCCOY
JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
DAUPHINOT and MCCOY, JJ.

 

DELIVERED:  March 3, 2011











[1]See
Tex. R. App. P. 47.4.





[2]The
other defendants were dismissed, and Catalanotto’s other claims resolved, prior
to submission of the charge to the jury.





[3]At
the time of trial, Gandy was president of a real estate investment company.  He was also an attorney, although he had not
practiced law since 1992, and an accountant, although he also no longer practiced
accounting. Gandy met Moorman Meador in 1963.





[4]Meador
Oldsmobile, Inc.’s assets were transferred to Meador Oldsmobile L.L.C.; the
Meador Estate owns the L.L.C. 





[5]As
late as the fourth quarter of 2004, Catalanotto kept looking for a new
dealership for the employees.





[6]Catalanotto’s
pay formula was a complex arrangement of $1,000 per month as salary, $80 per
used car sold retail, 4.75% of the dealership’s net profits, and 7% of net
profits from a used car lot affiliated with the dealership, among other
benefits.





[7]The
memo’s eight paragraphs about severance calculation set out that the amount per
employee would be determined by taking the greater amount of annual pay from
2003 or 2004, dividing the amount by fifty-two, and then multiplying it by
years of service.  The memo also states
that employees who left before being asked to would not be eligible to
participate in the plan.





[8]Spillar
had also drawn lines through the names of three individuals not involved here
and through each line item associated with their names, and he did not write an
amount of severance pay for them.





[9]Gandy
admitted that he did not initially recall preparing the memo and sending the
email about it, and he acknowledged that during a 2006 deposition in a lawsuit
by a former dealership employee, he stated that he did not remember the memo. 





[10]Gandy
read the definition of “severance pay” from Black’s Law Dictionary to the jury,
reciting, in pertinent part, “Payment by an employer to [an] employee beyond
his wages on termination of his employment. 
Generally, it is paid when termination is not due to the employee’s
fault.”





[11]Catalanotto
admitted that he became concerned about whether he would be able to retain the
employees at Meador Oldsmobile several times between December 2000 and January
2005.





[12]The
only evidence Catalanotto specifically directs us to as inadmissible is “Mr.
Gandy’s testimony about his subjective intent regarding the Severance Pay
Memo.” 





[13]During
the hearing on Meador Oldsmobile’s motion for directed verdict, the trial court
spelled out the jury issue:

[W]hat we’re going to do is we’re going
to submit a charge to the jury that inquires as to whether or not the
contracting party . . . entered into a contract with the plaintiff.  And that’s what this all boils down to.  It’s up or down, “yes” or “no.”  If they did, the contract says how he
calculates what he’s supposed to get.  If
it didn’t, he doesn’t get it.