NO. 07-11-0381-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 23, 2013
_____

FRANCIS JAEGER, CHRISTIE JAEGER, DAN BECKMAN
AND JERETTA BECKMAN,

Appellants

v.

ROBERT HARTLEY, MARY CORRIGAN, CHARLES ALLEN REEVES AND EDITH M.
VAUGHT A/K/A MARY EDITH VOUGHT A/K/A MARY EDITH VOUGHT,
INDIVIDUALLY AND D/B/A ELKINS RANCH, ET AL.,

Appellees
_____

FROM THE 181ST DISTRICT COURT OF RANDALL COUNTY;

NO. 59,377-B; HONORABLE JOHN B. BOARD, PRESIDING
_____

*Opinion*
_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

We have before us an appeal from final summary judgments denying Francis and Christie Jaeger (the Jaegers) and Dan and Jeretta Beckman (the Beckmans) recovery against Robert Hartley, Mary Corrigan, Charles Allen Reeves, and Edith M. Vaught, individually and as Elkins Ranch, Mary Corrigan and Charles Allen Reeves, as co-trustees of the Louise Reeves Revocable Living Trust UTD, independently and as

Elkins Ranch, Edith Vaught as trustee of the Vaught Family Revocable Living Trust, independently and as Elkins Ranch, and Michael Lancaster (collectively referred to as Elkins). We reverse.[1]

*Background*

The dispute arose from an accident occurring on the Elkins Ranch. The Beckmans and Jaegers were participating in a commercial tour of Palo Duro Canyon allegedly conducted by Elkins Ranch. The latter provided both a jeep for them to ride in and a driver or tour guide (*i.e.*, Lancaster) to operate the vehicle. Evidence also appears that indicates they were told to obey Lancaster's directions.

While the tour was proceeding up a steep incline in the canyon, the jeep stalled, its brakes failed, and it began rolling down the incline. As it did, Lancaster told the Jaegers and Beckmans to jump from the vehicle. They were not wearing seat belts at the time per the directive of Lancaster. Eventually the jeep tumbled onto its side and stopped.

The Jaegers and Beckmans suffered injuries and sued Elkins. The latter moved for summary judgment, contending that the document entitled *Waiver and Assumption of Risk* executed by their opponents relieved them of liability, that their opponents

---

[1]Question has again arisen as to whether this court has jurisdiction over the appeal. The matter involves the claims asserted against Robert Hartley. He was a named defendant who died before filing any motion for summary judgment. Nonetheless, the trial court executed a summary judgment expressly stating that "[t]his judgment finally disposes of *all* parties and *all* claims and *is appealable*." (Emphasis added). The latter is a clear expression of the trial court's intent to render a final, appealable decree despite granting relief to a defendant who had not requested it. This situation is akin to that described by the Supreme Court in *Jacobs v. Satterwhite*, 65 S.W.3d 653, 655 (Tex. 2001), where it recognized a difference between granting relief to parties in excess of that actually sought in a motion for summary judgment and granting relief that fails to dispose of all claims and parties. The latter does not result in a final, appealable decree while the former is. Here, the words used by the trial court in its summary judgment granted complete relief and disposed of all parties and claims. As such, it is final, though reversible as to the claims asserted against Robert Hartley.

breached the foregoing contractual waiver by suing, and that recovery could be had only if they were reckless (as opposed to merely negligent). The motions for summary judgment were granted, but the trial court specified no particular ground upon which it acted.

*Discussion*

1.      *Standard of Review*

The standard of review we must apply when entertaining an appeal from a final summary judgment is described in *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex. 1985). There is no need for us to reiterate it.

2.      *Effect of the Waiver and Assumption of Risk Document*

In its motion for summary judgment, Elkins asserted that the Jaegers and Beckmans assumed the risk of injury arising from their participation in the tour by signing the aforementioned waiver and assumption of risk agreement.[2] The latter contained the following language:

> I . . . voluntarily sign this Waiver and Assumption of Risk in favor of ELKINS RANCH, its Owners, agents, or employees, in consideration for the opportunity to enter upon and use the Ranch facilities; and to engage in activities sponsored by the Owners . . .
>
> Driving, or parking, of customers' vehicles; Walking; Hiking; Horseback riding and instruction; Jeep tours; Hunting; Interactions with all livestock, or wildlife; Camping . . .; Consumption of food, or beverage; Use of customers [sic] own personal horse, vehicle, trailer, or equipment while on Ranch property; Any and all indoor, or outdoor activities, however related, while on Ranch premises.
>
> I understand that there are certain risks and dangers associated with the various activities, use of the facilities, and the wilderness environment; and that these risks have been fully explained to me. I fully understand

---

[2]While the document mentions both an assumption of risk and waiver, Elkins relies simply on the former to defeat liability. So we render no opinion on whether the two defenses are one and the same or actually two distinct theories.

3

the danger involved. I fully assume the risks involved as acceptable to me, and I agree to use my best judgment in undertaking these activities and follow all safety instructions.

I do hereby waive, release, acquit and forever discharge ELKINS RANCH, its Owners, agents, employees and all persons and entities of; [sic] from any/all actions, causes of action, claims, demands, damages, costs, loss of services, expenses, and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries, property damage, or death resulting from my presence on Ranch premises, use of facilities, or from my participation in the activities. This Waiver/Release contains the Entire Agreement between the parties, and the terms of this Waiver/Release are contractual and not a mere recital.

I further state that I am a competent adult of lawful age, and I have carefully read the foregoing Waiver/Release and know its contents. I assume these risks and sign the same of my own free will . . . .

The executed document allegedly "precludes any recovery" by the signatories against Elkins. And, the latter cite our opinion in *Willis v. Willoughby*, 202 S.W.3d 450 (Tex. App.–Amarillo 2006, pet. denied) to support their position.

In *Willis*, the plaintiff (Willis) broke her ankle while participating in self-defense training. That is, she was attempting to thwart a charge by her instructor when the two collided and fell to the ground. Engaging in this exercise somehow resulted in the broken ankle. Before participating in the activity, Willis executed a document containing the following language:

I understand that self-defense training is inherently dangerous and I knowingly and willingly assume all risk of injury or other damage associated with such training. I release all teachers, students, and other parties from any claim of any and all liability that may result from any injury received, and I hereby waive all claims that I, or anyone else on my behalf, may make with respect to such injury or damages. I agree for myself and my successors that . . . should I or my successors assert any claim in contravention to this agreement, I and my successors shall be liable for the expenses including . . . legal fees incurred by the other party or parties in defending unless the party or parties are adjudged finally liable on such claim for willful and wanton negligence . . . .

4

*Willis v. Willoughby,* 202 S.W.3d at 452. We held that by signing the document, Willis had contractually "assumed 'all risk of injury . . . associated with such training,'" and she "effectively relieved Willoughby of the duty to protect her from foreseeable injury while instructing her in self-defense." *Id.* at 453; *accord Thom v. Rebel's Honky Tonk,* No. 03-11-0700-CV, 2012 Tex. App. LEXIS 7555, *17-18 (Tex. App.–Austin August 30, 2012, no pet.) (stating that "[t]he effect of the [contractual] assumed-risk defense is to negate any duty owed to the plaintiff by the defendant to protect against foreseeable risks"). We have no question about the continued viability of the law espoused in *Willis.* Yet, that does not mean it is of benefit to Elkins.

As we said in *Willis*, the common law doctrine of assumed risk no longer exists. *Willis v. Willoughby,* 202 S.W.3d at 453. Yet, one may still assume the risks inherent in engaging in a certain activity by contract and thereby relieve others of a duty to protect against foreseeable risks. *Id.* And, therein lies the quandry -- determining what risks are foreseeable. A good starting point in making that determination would be the writing or contract that supposedly vitiates the duty of care. *See Rice v. Metropolitan Life Ins. Co.,* 324 S.W.3d 660, 669 (Tex. App.–Fort Worth 2010, no pet.) (stating that we turn to the contract's wording to assess the obligations assumed by the parties).

The agreement before us explains that it was to be executed in exchange for the signatory being allowed to "enter upon and use the Ranch facilities; and to engage in activities sponsored by the Owners." Through it, the signatory agreed to "fully assume the risks involved." The "risks involved" consisted of those "certain risks and dangers associated with the various activities, use of the facilities, and the wilderness environment . . . ." And, the "activities" contemplated or occurring on the Ranch were:

5

> Driving, or parking, of customers' vehicles; Walking; Hiking; Horseback riding and instruction; Jeep tours; Hunting; Interactions with all livestock, or wildlife; Camping . . .; Consumption of food, or beverage; Use of customers [sic] own personal horse, vehicle, trailer, or equipment while on Ranch property; Any and all indoor, or outdoor activities, however related, while on Ranch premises.

So, 1) the nature of the environment, *i.e.*, a ranch and wilderness, 2) the facilities present and their use, and 3) the activities being conducted combine to form the nucleus from which the risks assumed were to emanate. That the Jaegers and Beckmans were injured while venturing into the canyon wilderness while on a jeep tour of that wilderness is clear. But the injuries did not stem simply from the tour being conducted in a wilderness or canyon environment. That is, canyon walls did not give way or the ground subside or the terrain cause the jeep in which they rode to leave the pathway or flip, or the like. Similarly, exposure to or interaction with the flora or fauna of the environment was not the event that caused injury.

Instead, summary judgment evidence indicates that the injuries arose from the Elkins' tour guide attempting to ascend a steep slope with a jeep that had defective brakes. There is no evidence that anyone told the Jaegers or Beckmans that they would be traversing rugged terrain in such a vehicle before they signed the release instrument. Nor is there evidence that they were made aware of the possibility that the vehicle on which they would ride could be defective and ill-suited for the venture. Nor were they told that the tour would or could continue on equipment that became defective during the event. More importantly, the Elkins' tour guide became aware of the defect with the brakes yet continued the tour. These circumstances and the relationship between the act and injury they evince are unlike those in *Willis*. There,

6

Willis' injury occurred during a training exercise that went somewhat awry. The nexus between the two was quite direct. As we said there:

> . . . the training contemplated . . . involved learning techniques to counteract physical attack from those whom [Willis] guarded. The techniques were not merely verbal but implicated the use of physical contact and force. That the application of contact and force sufficient to deter aggression can result in bodily injury is a matter of common sense; indeed, Sandra herself admitted, via deposition, that she understood the possibility of that happening while engaged in the class.

*Willis v. Willoughby,* 202 S.W.3d at 453. Suffering injury as a result of being struck or falling during a self-defense exercise is quite foreseeable since the exertion of force or application of physical contact by another is part of the exercise. Willis had agreed to engage in an exercise involving forceful physical contact, knew of the potential for injury arising from such contact, and suffered an injury caused by the very contact in which she was to engage. Had she been injured because the exercise had resulted in her falling upon a mat containing a sharp object or because the floor gave way from the impact, or the like, the outcome may not have been the same.

The same is true of the circumstances in *Honky Tonk.* There, the plaintiff was thrown from a mechanical bull. He had previously signed a release with the following language:

> I acknowledge that riding a mechanical bull entails known and unanticipated risks that could result in physical or emotional injury, paralysis, death to myself, to property, or to third parties. I understand that such risk simply cannot be eliminated without jeopardizing the essential qualities to the activity.
>
> THE RISKS INCLUDE, BUT ARE NOT LIMITED TO[]: Falling off of or being thrown from the mechanical bull, which could result in muscu[lo]skeletal injuries including head, neck and back injuries.

*Thom v. Rebel's Honky Tonk*, No. 03-11-00700-CV, 2012 Tex. App. LEXIS 7555, at *18-19. That verbiage expressly mentioned risks of injury due to being thrown from the device, and more importantly, that is how the plaintiff in *Honky Tonk* suffered injury -- he was thrown from the bull. There was no evidence that the ride was defective or that the owners knew of any defect in the bull yet allowed the participant to mount it.

Here, it may be reasonable to foresee from the writing at bar the potential for injury arising from one's traversing a wilderness or canyon by vehicle. But, it is not reasonable to infer from the same verbiage that part of the tour would consist of being driven around a wilderness and canyon area in a vehicle with defective brakes or that an Elkins' employee would continue a tour through a canyon while knowing about the defect.[3]

We therefore conclude that the summary judgment record submitted by Elkins does not demonstrate as a matter of law that the risk at bar (*i.e.,* using a jeep with defective brakes to conduct a wilderness tour and continuing the tour after gaining knowledge of such a defect) causing the injury at bar (*i.e.*, being thrown from the jeep because its brakes could not stop it from rolling down a steep ascent) was foreseeable. Said another way, Elkins has not demonstrated as a matter of law that the Jaegers and Beckmans gave, in the words used in *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 758 (Tex. 1975), "knowing and express oral or written consent to the dangerous activity or condition." Elkins has not shown its entitlement to summary judgment under the contractual doctrine of assumed risk.

---

[3]We note that the record contains evidence that the tour guide requested another employee of Elkins to bring him brake fluid during the tour because the jeep's brakes were not working. That individual appeared in a separate vehicle, but no fluid was added to the brake system. It was after this event that the tour guide 1) directed the Beckmans and Jaegers to return to the jeep, and 2) continued the tour.

3.     *Standard of Liability Requires Recklessness*

Elkins also sought summary judgment on the ground that its jeep tour was comparable to participating in a sporting event and that those sponsoring such events are liable only for injuries arising from reckless or grossly negligent conduct. They cited our decision in *Hathaway v. Tascosa Country Club, Inc.,* 846 S.W.2d 614 (Tex. App.– Amarillo 1993, no writ), as support for the proposition. In *Hathaway*, the plaintiff was hit by a golf ball while playing golf. Because getting hit with a golf ball while on a golf course was a foreseeable event, we concluded "that for a plaintiff to prevail in a cause of action against a fellow golfer, the defendant must have acted recklessly or intentionally." *Id.* at 617.[4] Were we to assume that participating in a canyon tour is comparable to playing golf, Elkins still would not be entitled to summary judgment as a matter of law, however.

To be reckless, a defendant must engage in conduct that he knew or should have known posed a high degree of risk of serious injury but disregarded that risk. *Wal-mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex. 1996). Evidence appears of record here disclosing that the Jaegers and Beckmans were directed by Elkins to obey the employee provided as their tour guide, their tour guide informed them not to wear their seat belts, the tour guide began and then became aware of the jeep's defective brakes, and the employee continued that tour by going up a steep slope despite knowing of the defect. A factfinder could reasonably infer from it that the

---

[4]*But see, McClain v. Baker*, No. 14-96-00487-CV, 1997 Tex. App. LEXIS 3808, at *4 (Tex. App.– Houston [14th Dist.] July 24, 1997, no writ) (not designated for publication) (stating that "the Texas Supreme Court recently rejected the reckless disregard standard for claims involving competitive contact sports because the reckless or intentional standard 'is not workable to ferret out unmeritorious claims.' *Davis v. Greer*, 940 S.W.2d 582, 583 (Tex. 1997)" and that the standard is simply one of foreseeability).

9

employee acted recklessly.[5]   Thus, there is evidence satisfying the standard of misconduct invoked by Elkins.

4.      *Breach of Contract*

Elkins finally sought summary judgment on the ground that the Beckmans and Jaegers breached their contract wherein they assumed the risk of injury by suing Elkins. Having previously concluded that the risks assumed did not encompass the risk causing injury here, Elkins failed to prove, as a matter of law, that the suit breached the agreement.

The summary judgments are reversed and the cause remanded to the trial court.


Brian Quinn
Chief Justice

---

[5]Whether that conduct may be imputed to his employers is not before us.